NOT RECOMMENDED FOR PUBLICATION
File Name: 10a0407n.06
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Jul 12, 2010**
LEONARD GREEN, Clerk

MICHAEL YOSSEF WASEF, )
)
    Petitioner, ) ON PETITION FOR REVIEW FROM A
) FINAL ORDER OF THE BOARD OF
) IMMIGRATION APPEALS, AGENCY
v. ) No. A095 391 068
)
ERIC H. HOLDER, JR., )
)
    Respondent. )

Before:     **MARTIN** and **GRIFFIN**, Circuit Judges; **DUGGAN**,[*] District Judge

    **PATRICK J. DUGGAN**, District Judge. Petitioner Michael Yossef Wasef, a citizen of

Egypt,[1] seeks review of a final order of removal denying his application for asylum and withholding

of removal under sections 208 and 241 of the Immigration and Nationality Act ("INA"), 8 U.S.C.

§§ 1158 & 1231, and for protection under the regulations implementing the United Nations

Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

("CAT"), 8 C.F.R. §§ 1208.16-1208.18. In his application, Wasef, a Coptic Christian, alleges fear

of religious persecution and torture in Egypt. For the reasons set forth below, we DENY his petition.

---

    [*]The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of
Michigan, sitting by designation.

    [1]Wasef was born in Muscat, Oman, in 1983 and remained in Oman until 1992 when his
parents, both Egyptian citizens, returned to Egypt. Even so, Wasef has no citizenship rights in
Oman; he inherited his Egyptian citizenship from his parents.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The events giving rise to Wasef's application occurred in Egypt in April 2001. At that time Wasef was 17 years old and had established a friendship with a Muslim classmate named Ahmed. On occasion Ahmed waited for Wasef to finish evening Bible study classes so that the two could socialize after dusk. At some point Ahmed requested and Wasef agreed that Ahmed could wait in the same room where Wasef's Bible study took place. Though Ahmed did not participate in the bible study, he could hear the attendant discussions. Ahmed later confided in Wasef that his attendance was motivated in part by his desire to learn more about the Bible. Ahmed's father, who Wasef described as a fanatic Muslim, often made derogatory comments about Christians and their beliefs, and Ahmed wanted to explore the validity of those statements.

On the night before Palm Sunday in April 2001, Wasef and Ahmed stayed late at Bible study while Wasef prepared palm branches for the next morning's festivities. Ahmed's father somehow learned that Ahmed was late getting home because he had been at church with Wasef. The next week, on Easter Sunday, April 15, 2001, Wasef was attacked outside his apartment when he left for church by men wearing short gowns that Wasef associated with Muslim fanatic groups. The men accused Wasef of trying to convert Ahmed to Christianity, one man cut Wasef's upper lip by hitting him with a small blade, and another cut or stabbed Wasef's left side with a small knife. The men threatened to kill Wasef if he failed to stay away from Ahmed and then fled when two passers-by came upon the scene.

The two strangers helped Wasef up from the ground and into his apartment building. Wasef's mother, a nurse, treated his wounds at home by applying ointment and called the local police to report the incident. The local police informed Wasef's mother that disputes concerning religious matters fall within the jurisdiction of Egypt's security police. Wasef and his mother, however, did not want to involve the security police. Nonetheless, a member of the security police appeared at Wasef's home about one week later and took Wasef into custody. It is a crime in Egypt to convert a Muslim to Christianity.

Wasef was detained by the security police for three days. On the first day the security police pushed Wasef, verbally attacked him, and detained him in a dark room. On the second day the security police woke Wasef by kicking him, interrogated him, accused him of trying to convert Ahmed to Christianity, slapped him with their hands, and hit him with a stick. Wasef suffered bruises but did not otherwise require medical treatment. At some point during the second day, Wasef was allowed to speak with his mother by telephone. On the third day Wasef was released before noon with warnings that he should stay away from Ahmed.

Wasef's mother picked him up from the security police building. Outside Wasef and his mother observed two men wearing the same short gowns as the Muslim fanatics that attacked Wasef on Easter Day. Wasef believed that they were hiding some kind of weapon in their hands and Wasef's mother heard the men threaten Wasef's life. Wasef and his mother stopped a taxi passing in the street and were able to get away unharmed. The taxi took Wasef to a monastery where his mother had made previous arrangements for him to stay. Wasef lived at the monastery for the next two months. Meanwhile, Wasef's mother stayed in a home owned by another son in a different part

of Egypt.[2]  Though the other son owns the home in Egypt, he actually lives out of the country in Dubai.

On June 16, 2001, Wasef and his mother flew together to the United States and entered the country on visitors visas.  Before the April attack on Wasef, Wasef and his mother had obtained the visitors visas with the intention of visiting Wasef's sister in the United States later in the year.[3]  On November 26, 2001, Wasef filed an application for asylum and withholding of removal with Immigration and Naturalization (predecessor to the Department of Homeland Security ("DHS")).  On March 2, 2002, Wasef appeared for an interview with an asylum officer.

According to the asylum officer's "Assessment to Refer," Wasef "credibly testified" under oath that he had been attacked by four men in April 2001.  Wasef reported that the men hit him and accused him of attempting to convert Ahmed to Christianity but that they fled when the doorman to Wasef's building came to his aid.  Wasef allegedly testified that "he and his mother then went to the local police department to report the incident."  Wasef further described his three-day detention, the threatening men that appeared when he was released, and his stay at the monastery.  Though the asylum officer found Wasef credible, he concluded that the incidents described by Wasef did not constitute past persecution.  Furthermore, the asylum officer did not believe that Wasef had a well-founded fear of persecution based on his religious beliefs or that he would be unable to relocate

---

[2]Wasef has three brothers and one sister.  Two brothers live in Dubai, the third lives in New York, and his sister lives in Michigan.

[3]Wasef's sister is a United States citizen.

to avoid local problems. For these reasons, the asylum officer referred Wasef to an immigration judge ("IJ").

On March 8, 2002, the Immigration and Naturalization Service issued a Notice to Appear charging that Wasef is removable. In his removal proceedings before an IJ, Wasef admitted to the allegations in the Notice to Appear and conceded his removability but applied for asylum, withholding of removal, and protection under the CAT. On November 20, 2007, Wasef filed a supplemental application for asylum and an IJ conducted a removal hearing.

At the removal hearing, the IJ admitted several exhibits and heard the testimony of Wasef, Wasef's mother, and Wasef's sister. While testifying about the April 15, 2001, incident, Wasef indicated that he had been attacked by three men: the first held Wasef from behind and prevented him from screaming; the second stood in front of Wasef, did all the talking, and cut Wasef's lip; and the third held Wasef by his clothes, hit Wasef, and cut Wasef's side with a small knife. Wasef testified that the men fled in a vehicle when two strangers came passing by and that his mother called the local police on the telephone to report the incident.

Wasef's mother presented a similar version of events but testified that Wasef complained of being attacked by only two men. Since coming to the United States in 2001, Wasef's mother has returned to Egypt periodically to collect retirement payments. To date she has not been harmed in Egypt, but she does not return to the home where she lived with Wasef; she continues to stay in the home of her other son.

In opposing Wasef's application, the government challenged Wasef's credibility and presented evidence regarding country conditions in Egypt. As to this latter issue, the government

submitted the Department of State Country Reports on Human Rights Practices in Egypt for the years 2001, 2003, and 2006, as well as the Department of State International Religious Freedom Reports for Egypt for the years 2002 and 2007.[4]

On March 5, 2008, the IJ issued her oral decision on Wasef's application. Based on "numerous inconsistencies and discrepancies and omissions," the IJ concluded that Wasef was not credible and, therefore, not eligible for asylum, withholding of removal, or protection under the CAT. Even so, the IJ went on to conclude that, if Wasef were assumed to be credible and to have suffered past persecution, the government presented sufficient evidence to rebut the presumption of any well-founded fear of future persecution. After detailing some of the content of the various country reports, the IJ explained:

> While the reports certainly do not paint a picture of perfection or complete harmony in Egypt with respect to the interplay or the interrole of religious groups in Egypt, there is simply insufficient information in this record from which this Court could conclude that the respondent would have a well-founded fear of returning to Egypt based upon his alleged attempts to convert his friend to Christianity.

Furthermore, the IJ found that the government presented sufficient evidence to establish that Wasef could reasonably avoid future persecution by relocating to another part of Egypt. In support of this finding, the IJ noted that higher percentages of Christians reside in upper Egypt and that Wasef's mother had been able to return to that area of Egypt without being harmed. Finally, the IJ found that Wasef failed to demonstrate his eligibility for asylum based on his present membership in MECA.

---

[4]Wasef also submitted documentary evidence in support of his application including numerous news articles discussing the treatment of Coptic Christians by Muslims in Egypt and proof of his membership in the Middle East Christians Association ("MECA").

Because the record failed to establish Wasef's eligibility for asylum, the IJ also concluded that Wasef is ineligible for withholding of removal or protection under the CAT.

Wasef timely appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). On appeal, Wasef challenged the IJ's factual findings and presented new evidence of country conditions in Egypt arising from events that occurred after the IJ's opinion.

On March 11, 2009, the BIA issued an opinion affirming the IJ's adverse credibility finding based on inconsistencies regarding the number of men that attacked Wasef, Wasef's failure to mention that he was stabbed during his asylum interview, inconsistencies regarding the identity of the person or persons that scared away Wasef's attackers, and inconsistencies regarding the method by which Wasef and his mother reported the attack to local police. All other grounds cited for the adverse credibility finding by the IJ were rejected by the BIA as either unsupported by the record or irrelevant to Wasef's claim of past persecution.

The BIA's opinion also affirmed the IJ's conclusion that, "[e]ven if we assume [Wasef] is credible and experienced past persecution, . . . the presumption of a well founded fear was overcome." Based on these findings, the BIA also affirmed the IJ's denial of asylum, withholding of removal, and protection under the CAT. As to the new evidence submitted on appeal, the BIA considered it only insofar as it could provide a basis for remand but concluded the evidence was insufficient for the relief requested. Therefore, the BIA dismissed Wasef's appeal.

Wasef timely filed his petition for review with this Court on April 8, 2009. *See* 8 U.S.C. § 1252(b)(1) (providing 30 days within which to file a petition for review of a final order of removal). Wasef challenges the BIA's adverse credibility finding, asserts that he has a well-founded fear of

persecution based on past persecution and his membership in MECA, argues that the government failed to rebut his well-founded fear of persecution, and claims that the BIA erred in failing to remand the case to the IJ for consideration of new evidence indicating an increase in persecution of Coptic Christians in Egypt.

## II.  STANDARD OF REVIEW

Where the BIA reviews the IJ's decision de novo and issues a separate opinion, rather than summarily affirming the IJ's decision, this Court reviews the BIA's decision as the final agency determination. *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007).  To the extent that the BIA adopted the IJ's reasoning, however, the Court also reviews the IJ's decision. *See Patel v. Gonzales*, 470 F.3d 216, 218 (6th Cir. 2006).  Thus, in the present matter, where the BIA issued a separate decision rejecting some portions of the IJ's opinion but adopting others and adding additional reasoning, the Court reviews both decisions. *Id.*  This Court reviews the IJ's and BIA's factual findings under the substantial evidence standard. *Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007).  "These findings 'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* (*quoting* 8 U.S.C. § 1252(b)(4)(B)).

## III.  ANALYSIS

The disposition of an asylum application involves a two-step inquiry: (1) whether the applicant qualifies as a "refugee," as defined in 8 U.S.C. § 1101(a)(42)(A), and (2) whether the applicant merits a favorable exercise of discretion by the Attorney General. *Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007).  Section 1101(a)(42)(A) of the INA defines a "refugee" as someone unwilling to return to his or her home country "because of persecution or a well-founded

fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

An applicant for asylum bears the burden of demonstrating that "'persecution is a *reasonable possibility*' should he be returned to his country of origin." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (*quoting INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987)) (emphasis added). This is something less than a "probability" of persecution. *See id.* at 621. Demonstration of a well-founded fear of persecution requires proof of a subjective and an objective component: "an alien must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which this fear can be deemed reasonable." *Id.* at 620 (*quoting Cardoza-Fonseca*, 480 U.S. at 430-31).

Where an applicant demonstrates that he has suffered past persecution, the applicant is presumed to have a well-founded fear of future persecution. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1989) (*citing* 8 C.F.R. § 208.13(b)(1)(i) (1997)). The government may then rebut that presumption with proof by a preponderance either that:

> (1) since the persecution occurred, conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted on one of the statutory grounds if he or she were to return, or (2) the applicant could avoid future persecution by moving to another part of his or her country of nationality, and it would be reasonable to expect the applicant to do so.

*Gilaj v. Gonzales*, 408 F.3d 275, 288 (6th Cir. 2005).

The standards required to qualify for withholding of removal or relief under CAT are more stringent than those for establishing eligibility for asylum. *Bah v. Gonzales*, 462 F.3d 637, 643 (6th Cir. 2006). In order to qualify for withholding of removal, an applicant "must establish that there

is a *clear probability* that he will be subject to persecution if forced to return to the country of removal." *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004) (emphasis added) (citations omitted). In order to obtain relief under the CAT, the applicant bears the burden of establishing that "it is *more likely than not* that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2) (emphasis added). Thus if an applicant fails to establish eligibility for asylum, his withholding of removal and CAT claims necessarily fail.

### A. The BIA's Adverse Credibility Finding

In his petition for review, Wasef argues that the BIA erroneously upheld the IJ's adverse credibility finding. Even if we accept Wasef's credibility for the sake of argument, however, Wasef cannot establish error in the IJ's alternative finding that the government overcame any well-founded fear of persecution. For this reason, we do not address the adverse credibility issue.

### B. Rebuttal of the Presumption of a Well-Founded Fear of Persecution

Even assuming that Wasef was credible and suffered past persecution, the BIA, adopting the reasoning of the IJ, concluded that the government sufficiently rebutted any well-founded fear of future persecution. Specifically, the BIA affirmed the IJ's conclusion that Egypt's present country conditions fail to justify a well-founded fear of future persecution and, to the extent there is a risk of future persecution, that Wasef could reasonably relocate within Egypt to avoid it. Substantial evidence in the record supports these findings.

### 1. Changed Country Conditions

Based on the contents of State Department Country Reports, the IJ found that present conditions in Egypt fail to justify any well-founded fear of future persecution by Wasef. The BIA

adopted that portion of the IJ's opinion.  In his petition for review, Wasef argues that "[t]he IJ erred in not properly weighing all of the evidence of record against the U.S. State Department Reports." Wasef maintains that "numerous articles" submitted to the IJ support his well-founded fear of persecution.

"Although this circuit acknowledges that State Department reports may be problematic sources on which to rely, . . . such reports are generally the best source of information on conditions in foreign nations." *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004) (internal quotations and citations omitted).  As such, State Department reports may be sufficient to justify a finding of changed country conditions, especially on review under the substantial evidence standard.  *See Ramaj v. Gonzales*, 466 F.3d 520, 531 (6th Cir. 2006).  In some cases, however, changed conditions reflected in country reports may be insufficient to rebut an individualized threat of future persecution.  *See Mapouya v. Gonzales*, 487 F.3d 396, 412-13 (6th Cir. 2007).

The articles submitted by Wasef to the IJ in this case do not establish an individualized threat of future persecution unaccounted for by the country conditions reflected in the State Department reports.  While some of the articles reflect adverse treatment of activist members of MECA, there is no evidence in the record to support a well-founded fear that Wasef would be subjected to similar treatment.  Wasef joined MECA in 2005, four years after leaving Egypt.  As observed by the IJ, "there is no evidence that any official from the government of Egypt or anybody has any knowledge that the respondent has even been involved in this association."  It is, therefore, unlikely that Wasef would be targeted for persecution on this basis.

Other articles submitted by Wasef report alleged kidnappings of young Coptic Christian women. Being an adult male, it is unlikely that Wasef would face similar risks if removed to Egypt. Furthermore, while addressing similar kidnapping allegations, the State Department reports indicate that "[o]bservers, including human rights groups, find it extremely difficult to determine whether compulsion was used, as most cases involve a female Copt who converts to Islam when she marries a Muslim male." These articles therefore do not to compel reversal of the IJ's factual finding that present country conditions in Egypt fail to justify a well-founded fear of future persecution by Wasef.

The remaining articles submitted by Wasef report civil disorder and other incidents between Muslims and Coptic Christians, including some events also described in the State Department reports. Though the violence reflected in these articles is unfortunate, it fails to establish "persecution," which is to say that it fails to establish "the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim." *Khalili v. Holder*, 557 F.3d 429, 436 (6th Cir. 2009) (citation and internal quotation marks omitted). The State Department reports summarize these same and similar outbreaks of violence between Muslims and Coptic Christians stating, "Christians and Muslims share a common culture and live as neighbors throughout the country. However, religious tensions exist and individual acts of prejudice and violence occur." Oftentimes, these outbreaks of violence are accompanied by the deployment of security or police forces and the detainment of Muslim aggressors. As such, the articles submitted by Wasef detailing these outbreaks of violence fail to establish "persecution," let alone an individualized threat of future persecution specific to Wasef.

In sum, the articles submitted by Wasef in support of his claimed fear of future persecution did not require that the IJ reject the contents of the State Department reports as evidence of changed country conditions. Generally, the articles describe treatment unlikely to befall Wasef or incidents already accounted for in the State Department country reports. As such, substantial record evidence supports the IJ's analysis of Egypt's country conditions.

### 2. Reasonable Relocation

The IJ also found, and the BIA agreed, that Wasef could reasonably relocate within Egypt to avoid any alleged persecution. Disputing this finding, Wasef argues that the IJ improperly considered evidence that his mother has returned to Egypt unharmed because it was Wasef, not his mother, who was accused of attempting to convert Ahmed to Christianity. Furthermore, Wasef maintains that the articles submitted in support of his claim prove the existence of nationwide violence that would make relocation ineffective. Wasef's arguments are insufficient, however, to justify reversal of the IJ's factual finding under the substantial evidence standard.

Substantial record evidence supports the IJ's factual finding that Wasef could reasonably relocate within Egypt to avoid alleged persecution. As previously discussed, the articles submitted by Wasef fail to evidence nationwide violence that rises to the level of "persecution." Meanwhile, the State Department reports indicate that "[m]embers of non-Muslim religious minorities . . . generally worship without harassment and maintain links with coreligionists in other countries." Additionally, the reports note that Christians live throughout Egypt, with higher percentages "in Upper Egypt (the southern part of the country) and some sections of Cairo and Alexandria." This evidence, combined with the fact that Wasef's problems in Egypt arose strictly from his contact with

Ahmed, suggests that Wasef could avoid future incidents by relocating within Egypt. Indeed, Wasef lived in a monastery away from Ahmed's family for two months after the initial attack without suffering any additional harm or harassment. If Wasef relocated to the area where his brother owns a home—Alexandria, Egypt—he would be distanced from Ahmed and his attackers and live in an area known to have a higher percentage of Christians that "generally worship without harassment." Therefore, substantial evidence supports the IJ's factual finding that Wasef could reasonably relocate to avoid any alleged persecution.

The IJ's factual findings as to Egypt's present country conditions and Wasef's ability to reasonably relocate rebuts any well-founded fear of future persecution established by Wasef. Without a well-founded fear of future persecution, Wasef does not qualify as a "refugee" and is ineligible for asylum. *See Hamida*, 478 F.3d at 736.

## C. Withholding of Removal and Protection under CAT

As previously indicated, the standards required to qualify for withholding of removal or protection under the CAT are more stringent than those for establishing eligibility for asylum. In light of Wasef's failure to establish eligibility for asylum, his withholding of removal and CAT claims necessarily fail.

## D. Request for Remand

Finally, Wasef argues in his petition for review that the BIA abused its discretion when it failed to remand the case to the IJ for consideration of new evidence presented on appeal. Specifically, Wasef submitted new articles reporting additional violence against Coptic Christian

churches in Egypt after the issuance of the IJ's opinion. After reviewing this evidence, the BIA concluded:

> The evidence is not sufficient to show that the respondent has made a prima facie case for the relief requested. In other words, the country condition information fails to establish the necessary chance that persecution or torture will be incurred upon the respondent's return to Egypt not otherwise found by the Immigration Judge.

The new articles submitted by Wasef generally reflect incidents of civil unrest and violence similar to those accounted for by the State Department reports. Therefore, the BIA did not abuse its discretion in denying remand on this basis. *See Jaber v. Mukasey*, 274 F. App'x 469, 475 (6th Cir. Apr. 23, 2008) (concluding that supplemental evidence "of the same type originally submitted" does not justify remand).

## IV. CONCLUSION

Regardless of Wasef's credibility in this matter, substantial evidence supports the IJ's factual finding that Wasef lacks a well-founded fear of future persecution in Egypt. Furthermore, the BIA did not abuse its discretion when it denied Wasef's request for a remand to the IJ for consideration of new evidence. For the foregoing reasons, we DENY Wasef's petition for review.