NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0708n.06

No. 10-3404

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*Oct 12, 2011*

LEONARD GREEN, Clerk

EVGUENE BORODACHEV, *et al.,*    )
                                 )
    **Petitioners,**             )
                                 )
                                 )    ON PETITION FOR REVIEW OF A
                                 )    DECISION OF THE BOARD OF
                                 )    IMMIGRATION APPEALS
ERIC H. HOLDER, JR.,             )
**United States Attorney General,** )
                                 )
    **Respondent.**              )

BEFORE:    MOORE and COLE, Circuit Judges; and BECKWITH, Senior District Judge[*]

**BECKWITH, Senior District Judge.**

Petitioners Evguene Borodachev, Lioudmila Borodachev, and Larisa Borodachev petition this Court to review the decision of the Board of Immigration Appeals ("BIA") denying Petitioners' applications for asylum, withholding of removal, and relief under the regulations implementing the United Nations' Convention Against Torture ("CAT"). We find that substantial evidence supports the decision of the BIA, and therefore deny the petition for review.

I.

Petitioners in this case are Evguene Borodachev, his wife Lioudmila, and their daughter Larisa. Petitioners are citizens of Kazakhstan and lived in the capital city of Almaty. Petitioners

---

[*]The Honorable Sandra S. Beckwith, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

came to the United States in 1995 on nonimmigrant B-2 visitors visas. Later, Evguene changed his status to an F-1 student visa and remained on that status until August 2004. In October 2004, Petitioners filed applications for asylum, withholding of removal, and relief under the CAT based on fear of religious persecution if they were returned to Kazakhstan. Petitioners' applications were denied and the Department of Homeland Security ("DHS") initiated removal proceedings in February 2005. Petitioners renewed their applications for asylum, withholding of removal, and protection under the CAT when they appeared before the immigration judge ("IJ") in July 2007.

Petitioners are Baptists. They claim to have experienced religious persecution at the hands of Muslims beginning a few years after Kazakhstan became an independent country in 1991. Petitioners testified about six specific incidents in which Evguene and/or Lioudmila experienced violence or intimidation from Muslims in Kazakhstan.

In the summer of 1994, Evguene and Lioudmila were walking home when they were approached by a group of five or six Muslims. These people spit at Petitioners, called them humiliating names, and told them they had to leave the country. One of them hit Evguene in the mouth, splitting his lip, and Lioudmila was pushed to the ground and hit her elbow. Evguene reported this incident to the police but he claimed that they did not conduct any investigation. He did not go to the hospital for medical treatment, however.

In the fall of 1994, Petitioners and others in the Baptist community began receiving phone calls threatening them with death and telling them they had to leave the country because they were Baptists. Evguene testified, however, that he only received one such call. These threatening calls were reported to the police, but Evguene claimed that they failed to conduct any investigation.

2

In December 1994, a group of Muslims approached Lioudmila on the street and attacked her for not dressing like a Muslim woman because she was not wearing a scarf around her head. Lioudmila explained that she was a Christian and was not supposed to follow Muslim rules. The group then beat Lioudmila with sticks, inflicting a concussion, causing scratches and bruises, and injuring her hand. Again, the police allegedly failed to take any action to investigate the incident.

In February 1995, Evguene was attacked by three men as he was walking home. He said these men called him "Baptist" and other derogatory names and began hitting him with rubber-covered sticks. They kept hitting Evguene after he fell to the ground and his finger was broken as he was trying to protect his head. Evguene testified that he was admitted to the hospital with a concussion, bruises, and a broken finger. Again, the police allegedly failed to take any action to investigate the incident.

Evguene testified that in March 1995 his neighbors began dumping trash at his front door. On another occasion, paint was poured in front of his door. When he was cleaning the paint from the door, one of his neighbors approached him and said, "Do you get the hint, you have to leave?" When Evguene reported this incident to the police he said they responded by stating that they never get involved in disputes between neighbors.

In July 1995, Evguene testified that he was accosted on the street by two men, one of whom had a knife. The man pointed the knife at Evguene's stomach, called him names, and took him to a construction site. At the construction site, these men punched Evguene in the stomach and the neck so he would fall. When Evguene fell, they kept beating him, perhaps with brass knuckles. Evguene was also stabbed in the buttocks. Evguene testified that he was taken to the hospital where he received stitches for his knife wound. He said he was in the hospital for one day and then

3

released. Evguene testified that he gave descriptions of the men who attacked him but the police did nothing.

The IJ also accepted into evidence translations of hospital records and police reports relating to some of these incidents. The IJ received into evidence two undated, unsigned letters Petitioners received from a "sister in faith" which indicate generally that conditions had worsened for Baptists since Petitioners left Kazakhstan. Evguene testified that the letters indicated that returning to Kazakhstan would be a death sentence for him and his family. The IJ also received State Department reports on Kazakhstan which state that religious freedom in Kazakhstan is generally respected.

II.

The Attorney General, in his discretion, may grant asylum to a "refugee;" i.e., "a person who is unable or unwilling to return to his home country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) (quoting 8 U.S.C. § 1101(a)(42)(A)). Persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998). A showing of well-founded fear of future persecution requires a demonstration by the alien:

> (1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear.

*Pilica,* 388 F.3d at 950. Applicants who establish that they have suffered past persecution are presumed to have a well-founded fear of future persecution, but this presumption may be rebutted

4

by the government if it shows by a preponderance of the evidence that conditions in the country have changed so fundamentally that the applicant no longer has a well-founded fear of persecution. *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003).

Whereas granting asylum to a refugee is a matter of discretion exercised by the Attorney General, "[w]ithholding of removal is mandatory if an alien establishes that his 'life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Pilica*, 388 F.3d at 951 (quoting 8 C.F.R. § 208.16(b)). An alien seeking withholding of removal must demonstrate "that there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Id.* Because an alien must meet a higher burden in establishing a right to withholding of removal than in demonstrating asylum eligibility, an alien who fails to qualify for asylum necessarily does not qualify for withholding of removal. *See id.* at 955.

Finally, in order to obtain relief under the CAT, an alien must prove "'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Id.* at 951 (quoting 8 C.F.R. § 208.16(c)(2)).

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1). "In assessing the risk of torture, the adjudicator must consider the possibility of future torture, including any evidence of past torture inflicted upon the applicant and

evidence that the applicant is not likely to be tortured in another area of the country of removal." *Ali v. Reno*, 237 F.3d 591, 596-97 (6th Cir. 2001).

III.

The IJ denied Petitioners' applications for asylum, withholding of removal, and relief under the CAT. With respect to the application for asylum, the IJ found that Petitioners were not credible and that they embellished the incidents that they claimed occurred to them. The IJ stated that he believed that the incidents were street crime or neighborhood disputes not related to Petitioners' religion.

First, the IJ found that the medical records did not support the severity of the injuries Petitioners sustained in these incidents. The IJ noted, for instance, that at least two of the records indicate that Petitioners were treated for their injuries on an out-patient basis as opposed to their claims that they were admitted to the hospital.

Second, the IJ found that Petitioners downplayed the police interest in and response to these incidents. The IJ found that the records indicated that the police demonstrated reasonable efforts to investigate these incidents. He noted that one case was closed after an investigation in which the police were not able to locate the perpetrators. The IJ concluded that Petitioners failed to report two of the incidents because there was no accompanying report for them even though they had reports for other incidents. The IJ stated that it was not unreasonable that the police would not have solved these crimes. He concluded that Petitioners had not established that the police were unwilling or unable to protect them.

6

Third, the IJ found that Petitioners' testimony had other exaggerations. As an example, the IJ noted that Evguene stated that Almaty did not have many people in it when in fact it is the capital city of Kazakhstan with a population of over 1 million people.

Because the IJ concluded that Petitioners were not credible witnesses, he found that they needed corroboration to support their claims. The IJ found, however, that Petitioners had not met this requirement. He essentially doubted the veracity of Petitioners' religious convictions. The IJ noted that Petitioners had not submitted any letters from pastors or congregation members in either Kazakhstan or the United States which supported their involvement with the church. The IJ also found that the two letters from Petitioners' Kazakh "sister in faith," which relate deteriorating conditions for Baptists in Kazakhstan, were of dubious authenticity. Thus, the IJ concluded that Petitioners were not credible regarding the extent of and the religious motivation for the incidents of mistreatment they described.

The IJ next concluded that the incidents Petitioners described were not religious persecution but rather street crime and/or neighborhood disputes. In support of this conclusion, the IJ noted that Petitioners were not engaged in proselytizing or any other overt religious activities that would have drawn the attention of Muslim extremists and caused them to be singled out for abuse. Thus, the IJ concluded that Petitioners were not subject to past persecution. He also found that Petitioners failed to put on evidence that established a well-founded fear of future persecution based on their religion.

The IJ next determined that even if Petitioners were credible as to the past incidents and the reasons for them, they failed to show that they could not reasonably relocate to another part of Kazakhstan. The IJ noted that Almaty is a large city with over 1 million people, that Kazakhstan has

six cities with over 50,000 people, and that Petitioners offered no real reason for not attempting to relocate within Almaty or elsewhere in Kazakhstan.

The IJ also decided that another basis for denying Petitioners' applications was that, even if their claims were true, conditions in Kazakhstan had improved since they left the country. In reaching this conclusion, the IJ relied on the State Department reports which indicate that religious freedom in Kazakhstan is generally respected.

In light of this analysis, the IJ determined that Petitioners had failed to demonstrate they were entitled to asylum. Having failed to prove to the IJ that they were entitled to asylum, it followed that Petitioners were not entitled to withholding of removal. Finally, based on basically all of the same facts and analysis, the IJ denied Petitioners' CAT claims because they failed to establish that it is more likely than not that they will be tortured upon their return to Kazakhstan.

On appeal by Petitioners, the BIA issued a written decision affirming the IJ's order denying their applications. The BIA overturned the IJ's finding that the asylum applications were untimely but held that asylum was properly denied on the merits. In its decision, the BIA stated that it did not need to review the IJ's adverse credibility determinations because it agreed with the IJ that Petitioners had not demonstrated past persecution or a well-founded fear of future persecution. In reaching this conclusion, the BIA relied on most of the same discrepancies and inconsistencies highlighted by the IJ. The BIA specifically noted that Petitioners had failed to demonstrate past persecution because the documentary evidence contradicted their claims concerning the severity of the harm, the motive of their attackers, and the Kazakh police's response and investigation into their complaints.

8

With regard to whether Petitioners had established a well-founded fear of future persecution, the BIA gave significant weight to the evidence of changed country conditions as documented in the State Department reports indicating that religious freedom is generally respected in Kazakhstan. The BIA generally agreed with the IJ's assessment of the evidentiary value of the letters from Petitioners' "sister in faith" and thus concluded that the IJ was entitled to give the State Department reports more weight. Finally, the BIA determined that the police took reasonable steps to investigate the attacks on Petitioners. Based on this analysis, the BIA concluded that Petitioners failed to establish their claims for asylum and withholding of removal.

Lastly, the BIA determined that Petitioners' CAT applications failed because they failed to show a clear probability that they would be subject to torture at the instigation of, or with the consent or acquiescence of current government officials or persons acting in an official capacity. The BIA concluded that Petitioners had not shown that the Kazakh government would affirmatively consent or acquiesce to their torture.

Petitioners then filed a timely petition to review the BIA's denial of their applications for asylum, withholding of removal, and for relief under the CAT.

V.

Title 8 U.S.C. § 1252 authorizes the courts of appeal to review the BIA's decision affirming the IJ's denial of asylum, withholding of removal, and relief under the Convention Against Torture. *See Yu v. Ashcroft,* 364 F.3d 700, 702 (6th Cir. 2004); *Ali v. Reno*, 237 F.3d 591, 596 (6th Cir. 2001). This Court reviews administrative findings of fact, such as whether an alien qualifies as a refugee, under the substantial evidence standard, keeping in mind that such findings are "'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu*, 364 F.3d at 702

9

(quoting 8 U.S.C. § 1252(b)(4)(B)); *see also Ali*, 237 F.3d at 596; *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005)("The petitioner must demonstrate that the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution.") (internal quotation marks omitted).

## VI.

The IJ concluded that Petitioners exaggerated or embellished the seriousness of their previous encounters with their Muslim assailants and that they downplayed the Kazakh police's response to the incidents. The IJ, therefore, concluded that Petitioners' claims of persecution were not credible. Petitioners contend that the IJ erred in concluding that they were not credible about their claims of persecution. Petitioners argue that the IJ improperly relied on minor inconsistencies in rejecting their credibility and that he erred in concluding that their testimony lacked corroboration. Finally, Petitioners argue that the IJ and the BIA erred by relying on State Department reports in concluding that circumstances for Baptists have improved in Kazakhstan.

It is not necessary for us to review the IJ's credibility findings. In its decision, the BIA, while not specifically addressing the IJ's credibility determinations, appeared to express doubt about Petitioners' credibility, as is evidenced by its references to the discrepancies between Petitioners' testimony and the documentary evidence. The BIA, however, went on to deny Petitioners' applications on the grounds that they had failed to demonstrate past persecution or a well-founded fear of future persecution. Where the BIA fails to make an explicit credibility determination and instead denies relief on some other basis, this Court will assume that the applicant was credible and review the actual grounds for the ruling. *Haider v. Holder*, 595 F.3d 276, 282 (6th Cir. 2010).

10

Accordingly, if the stated basis for denying relief was supported by substantial evidence, further review by this Court is foreclosed. *Id.* Conversely, if the evidence compels the opposite result, we will remand for a specific credibility determination. *Id.*

In this case, we conclude that the BIA's determination that Petitioners failed to establish past persecution or a well-founded fear of future persecution was supported by substantial evidence. Similarly, the BIA's determination that Petitioners failed to demonstrate a clear probability of torture at the instigation of, or with the consent or acquiescence of, current Kazakh governmental officials was supported by substantial evidence. Therefore, further review of the BIA's determination denying Petitioners' applications for asylum, withholding of removal, and relief under the CAT is foreclosed.

In this case, the record shows that none of the incidents of violence and/or abuse alleged by Petitioners were perpetrated by Kazakh governmental officials. Rather, it appears that Petitioners were set upon by alleged Islamic street toughs. Where the government is not responsible for the persecution, the alien must demonstrate that the government is unwilling or unable to control those who are responsible. *Fisenko v. Holder*, 336 Fed. Appx. 504, 509 (6th Cir. 2009) (collecting cases). Therefore, in this case, Petitioners must demonstrate that the record compels a conclusion that the Kazakh government was unable or unwilling to control the persons allegedly persecuting them in order to be entitled to asylum.

The evidence in this case, however, does not *compel* the conclusion that the Kazakh government was unable or unwilling to protect Petitioners. While sparse, the records indicate that the local police at least attempted to investigate these incidents when Petitioners reported them. In the most serious incident, the police appointed an "expert criminalist" to investigate either the stab

wounds on Evguene's clothes or his body or both. The police investigated the incident where Lioudmila was pushed to the ground but were unable to find the perpetrators. While the police did not investigate who was dumping trash at Petitioners' door, they did install a coded system to control access to the building. The fact that the police did not apprehend the perpetrators does not mean that Petitioners were persecuted. Indeed, it seems that the Kazakh police did at least as much in this case to investigate the attacks on Petitioners as in other cases where this Court has held that the alien failed to demonstrate that the police were unwilling or unable to protect him. *Compare with Vasilev v. Holder*, 366 Fed. Appx. 585, 589 (6th Cir. 2010)(when petitioner was attacked police opened an investigation and notified the district attorney); *see also id. (*"That the police failed to apprehend the attackers did not compel the conclusion that the government was unwilling or unable to control violence against ethnic Russians."); *Skirko v. Gonzales,* 153 Fed. Appx. 958, 961 (6th Cir. 2005) (local government not unwilling or unable to protect petitioner from political persecution; police took report of incident but declined to investigate based on Ukranian criminal law); *Gromovik v. Gonzales*, 148 Fed. Appx. 479, 482 (6th Cir. 2005) (police laughed at petitioner but never indicated an unwillingness to investigate attack). Therefore, the BIA's conclusion that Petitioners were not subjected to past persecution is supported by substantial evidence.

Even if Petitioners cannot establish past persecution, they are entitled to asylum if they can establish a well-founded fear of future prosecution. *Ramaj v. Gonzales*, 466 F.3d 520, 529 (6th Cir. 2006); 8 C.F.R. § 208.13(b)(2). The fear of future persecution must be subjectively genuine and objectively reasonable. *Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007). The applicant, however, "cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual

12

persecution. " *Id.* (internal quotation marks omitted). Moreover, the applicant will not have a well-founded fear of future persecution if it would be reasonable for him to relocate to another part of the country to avoid persecution. *Vata v. Gonzales*, 243 Fed. Appx. 930, 944 (6th Cir. 2007).

The only evidence of any ongoing persecution of Baptists in Kazakhstan are the two letters from Petitioners' "sister in faith," which, as both the IJ and the BIA indicated, are of questionable authenticity since they are unsigned and undated. Petitioners did not submit any evidence that their parents, who still live in Almaty, are being persecution for being Baptist. Additionally, as the IJ noted, Petitioners did not provide any reason why they could not relocate to another part of Kazakhstan to avoid persecution. Finally, while Petitioners contest the credibility of the State Department reports on the grounds that the State Department tends to depict countries in the most favorable light in order to maintain friendly relations, the Sixth Circuit has consistently held that these reports are the best source of information on conditions in foreign nations*, Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004), and can be substantial evidence of changed country conditions. *Wasef v. Holder*, 387 Fed. Appx. 521, 528 (6th Cir. 2010). The State Department reports that there are generally amicable relations between religions in Kazakhstan. These reports are substantial evidence that Petitioners will not be subjected to religious persecution if they return Kazakhstan.

Thus, in summary, Petitioners have failed to demonstrate that substantial evidence compels a conclusion that they are entitled to asylum, withholding of removal, or relief under the CAT. Rather, the BIA's determination that Petitioners have not been subjected to past persecution and that they lack a well-founded fear of future persecution because of their religion, and therefore, are not entitled to asylum, was supported by substantial evidence. Because Petitioners' claims for asylum fail, their claims for withholding of removal fail as well. *Kaba v. Mukasey*, 546 F.3d 741, 751 (6th

Cir. 2008). Finally, because Petitioners have not shown a clear probability that they would be subject to torture at the hands or acquiescence of the government, they cannot meet the more stringent requirements for relief under the CAT. *Haider*, 595 F.3d at 289.

Accordingly, Petitioners' petition for review of the BIA's decision denying their applications for asylum, withholding of removal, and relief under the Convention Against Torture is **DENIED**.