**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0315n.06

No. 19-3825

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 02, 2020
DEBORAH S. HUNT, Clerk

LIDIA YORLENI REYES ALMENDAREZ )
*et al.*, )
     )
    **Petitioners,** )
     )
v. )
     )
WILLIAM P. BARR, Attorney General, )
     )
    **Respondent.** )

ON PETITION FOR REVIEW
OF A FINAL ORDER OF THE
BOARD OF IMMIGRATION
APPEALS

**OPINION**

---

**BEFORE: MOORE, SUTTON, and GRIFFIN, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** Lidia Yorleni Reyes Almendarez, her husband, Yony Eliu Melgar Trochez, their children, Jordi Isai Melgar Reyes and Jhonsen Zaret Melgar Reyes, Lidia's brother, Limhi Lenin Reyes Almendarez, and his daughter, Issi Beatriz Reyes Henriquez, petition for review of the Board of Immigration's ("BIA") denial of their applications for asylum.[1] They challenge the BIA's and immigration judge's ("IJ") conclusions (1) that the persecution of the family by Los Tercerenos, a Honduran gang, was not on account of their membership in a patrilineal family headed by Lidia and Limhi's father and (2) that the Honduran government was not unable or unwilling to protect the petitioners from their persecutors. We **DENY** the petition seeking review for the reasons that follow.

---

[1]We will refer to petitioners by first name because some share the same last names.

## I. BACKGROUND

Petitioners are citizens and natives of Honduras, specifically San Pedro Sula. *See, e.g.*, A.R. 135–36. At various points in 2011, 2012, and 2015, the family was victimized by Los Tercerenos and suffered tremendous personal loss. On January 1, 2011, Lidia and Limhi's father, Jesus Reyes Caballero, was murdered by Los Tercerenos because he refused to meet the gang's extortion demands with proceeds from his restaurant. A.R. 143–45, 223. The record does not indicate whether the family filed a police report or whether the police investigated Jesus's death. After his death, the family did not receive further threats of extortion. A.R. 153. However, the family received a phone call in 2012 stating that they were to provide free food to "all of them," and the family presumed it was Los Tercerenos. A.R. 223. The family notified the police, the officers came to the restaurant, and they stayed with the family for two hours. *Id.*

On October 4, 2015, Lidia and Limhi's brother, Jesus Alexander Reyes Almendarez ("Alex") had an argument with members of Los Tercerenos. A.R. 141–42. During a soccer game, Alex threw a ball and it hit the hand of a member, causing the member to drop his phone. *Id.* Alex attempted to apologize, but gang members threatened him, stating that he was "going to see blood running." *Id.* The next day, Alex was murdered by the gang. *Id.* Lidia, Limhi, and Jhonsen were with Alex when the attack occurred. A.R. 140. During the attack, Limhi sustained serious gunshot injuries. A.R. 146. Within minutes, the police arrived and took Limhi to the hospital. A.R. 145, 253.

Three days after Alex's death, Lidia filed a police report. A.R. 147. The police investigated Alex's murder, and, though unrelated to Alex's death, later made arrests that resulted in convictions of Los Tercerenos members for another murder. A.R. 150, 229–30. Lidia and Yony

testified that the police did little to solve Alex's murder, despite Lidia's participation in proceedings to press charges. A.R. 150, 164–65, 230. Yet Lidia and Yony did not follow up with the police because they feared that they would be further targeted by the gang. A.R. 230.

After Lidia filed the police report, she began to receive threats from Los Tercerenos. A.R. 141, 147. The first threat was a note that stated that the gang hoped to see her die for what she "had done," A.R. 147, 151, and that they would kill her family members "one after one," A.R. 172. Lidia was also followed one day. A.R. 147. The day of Alex's funeral, Lidia and her family moved two to three hours away to escape the frequent threats. A.R. 148–49. Los Tercerenos found her phone number, however, and continued to send threats to her via text and phone calls. A.R. 147, 150–51, 169–70. The gang told Lidia over the phone that that she "was going to see the devil alive." A.R. 151. Limhi received similar threats on an "[a]lmost daily" basis, A.R. 191–93, and another brother, Eybi Joshua Reyes Almendarez, was followed by Los Tercerenos once, A.R. 255.

On October 31, 2015, Yony's brother was murdered at his tire shop. A.R. 153–54. Lidia believed that members of Los Tercerenos killed Yony's brother because they mistook him for Yony. A.R. 167–68. She had that belief because of texts that she received from gang members saying that "[t]he revenge had begun" and that the victim was her husband. *Id.* Yony's father filed a police report. A.R. 226. Lidia testified that the police "didn't do anything" (except "file a report"), A.R. 154–55, and Yony stated that the police did not reveal the results of any investigation, A.R. 226–27. Lidia again reported the threats to the police, who advised her to stay indoors. A.R. 168. The threats continued until December 30, 2015, when Yony was followed by Los Tercerenos on his way home from work. A.R. 148, 225. Shortly after, Lidia, Yony, Jordi,

Jhonsen, Limhi, and Issa left Honduras on January 18, 2016. A.R. 138. The family arrived in the United States on August 4, 2016. A.R. 138–39.

Petitioners were charged as inadmissible for lacking valid entry documents pursuant to 8 U.S.C § 1182(a)(7)(A)(i)(I) and applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). A.R. 84. The IJ issued his opinion on January 23, 2018. *Id.* The IJ concluded that petitioners were credible but denied all applications for relief, ordering that the petitioners be removed to Honduras. A.R. 98, 104.[2] Regarding the petitioners' applications for asylum, the IJ concluded that petitioners had not demonstrated past persecution because (1) the harm the family suffered did not rise to the level of persecution, (2) assuming there was persecution, it was not because of their membership in a particular social group, "children of Jesus Reyes, and their spouses and children," (3) the Honduran government was not unwilling or unable to control their alleged persecutors, and (4) relocation within Honduras was not unreasonable. A.R. 98–102. The IJ also determined that petitioners did not establish a well-founded fear of future persecution, which would also justify asylum relief, and that petitioners were not entitled to withholding of removal or protection under the CAT. A.R. 102–04.

The BIA dismissed petitioners' appeal on August 2, 2019. A.R. 3–4. After adopting and affirming the IJ's decision, the BIA specifically affirmed the IJ on two grounds, both of which addressed the petitioners' asylum applications based on past persecution. First, the BIA concluded that there was insufficient evidence to establish that Los Tercerenos's persecution of the family

---

[2]The credibility determination is not disputed by the government.

was "on account of" their membership in a family group. A.R. 4. Second, the petitioners did not demonstrate that the Honduran government was unwilling or unable to protect the petitioners. *Id.*[3]

This petition for review followed. The petitioners seek review only of the BIA's denial of their asylum appeals. Pet'r Br. at 2.

## II. JURISDICTION AND STANDARD OF REVIEW

Generally, "we have jurisdiction to review final orders of removal of the BIA." *Umaña-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013). When the BIA adopts the IJ's decision and provides its own reasoning, we review the IJ *and* BIA opinions. *Mandebvu v. Holder*, 755 F.3d 417, 424 (6th Cir. 2014). Legal determinations receive de novo review. *Umaña-Ramos*, 724 F.3d at 670. We review the agency's factual determinations "under the substantial evidence standard," in which we ask whether the factual findings "are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Kamar v. Sessions*, 875 F.3d 811, 817 (6th Cir. 2017) (quoting *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004)). We reverse agency factual findings "only if the evidence 'not only supports a contrary conclusion, but indeed *compels* it.'" *Mandebvu*, 755 F.3d at 424 (quoting *Yu*, 364 F.3d at 702–03); 8 U.S.C. § 1252(b)(4)(B) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."). Though this standard is deferential, we "still give the administrative decision under review a 'hard look.'" *Marouf v. Lynch*, 811 F.3d 174, 181 (6th Cir. 2016) (quoting *N'Diom v. Gonzales*, 442 F.3d 494, 500 n.1 (6th Cir. 2006)).

---

[3]The BIA perfunctorily denied petitioners' withholding of removal claim. A.R. 4. Finally, the BIA noted that the petitioners here did not appeal the IJ's denial of CAT protection and held that the issue was waived. A.R. 3 n.1.

### III. ANALYSIS OF ASYLUM CLAIMS

The Immigration and Nationality Act ("INA") gives the Attorney General "discretion to grant asylum to applicants who meet the definition of a 'refugee.'" *Umaña-Ramos*, 724 F.3d at 670 (citing 8 U.S.C. § 1158(b)). An asylum applicant bears the burden of "demonstrat[ing] that she is a refugee as defined by the INA." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004). "A refugee is defined as a person who is unable or unwilling to return to [her] home country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *K.H. v. Barr*, 920 F.3d 470, 475 (6th Cir. 2019) (alteration in original) (quoting *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004)). When an asylum applicant's claim rests on past persecution that was not carried out by the government, the applicant "need only 'show that the [county of origin's] government was unwilling or unable to control [her persecutors] and protect her.'" *Id.* (last alteration in original) (quoting *Velasquez-Rodriguez v. Whitaker*, 762 F. App'x 241, 244 (6th Cir. 2019)); *Khalili v. Holder*, 557 F.3d 429, 436 (6th Cir. 2009). Petitioners seek review of the BIA and IJ determinations that (1) persecution at the hands of Los Tercerenos was not "because of" their membership in their proposed particular social group, Jesus's children, their spouses, and their own children, and (2) the Honduran government was not unwilling or unable to protect the petitioners from Los Tercerenos. Pet'r Br. at 2.

## A. Persecution "because of" membership in a statutorily protected category

Asylum seekers must demonstrate that they were "persecuted *on account of* or *because of*" their membership a protected category, such as a particular social group. *Marku*, 380 F.3d at 986; *see also Zaldana Menijar v. Lynch*, 812 F.3d 491, 500 (6th Cir. 2015) (considering whether there

was "a nexus" between persecution and the particular social group). A persecutor may have multiple, or "mixed," motives. *Marku*, 380 F.3d at 988 n.10; *see also Al-Ghorbani v. Holder*, 585 F.3d 980, 997 (6th Cir. 2009). However, "[t]he REAL ID Act clarified that, with respect to asylum claims, 'the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be *at least one central reason* for persecuting the applicant.'" *Guzman-Vazquez v. Barr*, ___ F.3d ___, No. 19-3417, 2020 WL 2520269, at *12 (6th Cir. May 18, 2020) (emphasis added) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). Asylum applicants cannot show persecution was "because of" their membership in a protected category by pointing to only "[g]eneral conditions of rampant gang violence." *Umaña-Ramos*, 724 F.3d at 670; *see also Zaldana Menijar*, 812 F.3d at 501 (stating that "widespread crime and violence does not itself constitute persecution on account of a protected ground"). Nor can applicants simply rely on the fact that family members were persecuted. *Akhtar v. Gonzales*, 406 F.3d 399, 406 (6th Cir. 2005).

Petitioners argue that the IJ and BIA misapplied the mixed-motive analysis by requiring that petitioners demonstrate that "the threats were based *exclusively*" on their family membership and "failed to consider the possibility of mixed motives." Pet'r Br. at 23 (emphasis added). This assertion is not borne out by the record. The IJ noted that the family suffered harm due to the gang's actions, but ultimately "failed to demonstrate that they suffered harm differing from what all residents of Honduras generally suffer [as a result of] the gang violence prevalent in that country." A.R. 100. The BIA similarly concluded that the family had failed to provide sufficient evidence that they were persecuted on account of their membership in their family group; it also cited *Matter of N-M-*, 25 I. & N. Dec. 526 (BIA 2011), A.R. 4, which expressly considered mixed

motives, *Matter of N-M-*, 25 I. & N. Dec. at 531. There is no indication that the BIA or IJ misapplied the "one central reason" standard or failed to consider the existence of mixed motives.

Petitioners fail to demonstrate that the evidence compels the conclusion that their relation to Jesus or Alex was a central reason for Los Tercerenos's alleged persecution. Petitioners point to Jesus's death in 2011 and an incident shortly thereafter regarding a phone call demanding free meals, but for at least three years, the family heard nothing from Los Tercerenos. Thus, it is difficult to infer that Los Tercerenos members were motivated to persecute the petitioners based on Alex, Lidia, or Limhi's relation to their father. As for the incidents in 2015, petitioners fail to show that Alex's death was based on anything other than a personal matter at a soccer field, and applicants cannot rely "*solely*" on "personal matters" to show that they were persecuted because of their membership in a protected category. *Al-Ghorbani*, 585 F.3d at 997 (quoting *Zoarab v. Mukasey*, 524 F.3d 777, 781 (6th Cir. 2008)).[4]

Moreover, there is substantial evidence showing that it was not membership in the family group, but Lidia's act of filing a police report that spurred Los Tercerenos to threaten the petitioners. The petitioners hypothesized that their relation to Jesus and Alex was the genesis of Los Tercerenos's campaign against them, *see, e.g.*, A.R. 170–71, 257–58, but the petitioners point to no evidence, testimonial or otherwise, that provides a factual basis for these statements. For example, the content of the threats focused on what Lidia had done by filing the police report, not on actions by her father or her relation to him. *See Gonzalez Ruano v. Barr*, 922 F.3d 346, 356

---

[4]Petitioners argue that the BIA and IJ concluded that the personal disputes with Jesus and Alex led the BIA and IJ to ignore the familial connections. Pet'r Br. at 21. Though "the simultaneous existence of a personal dispute does not eliminate [a] nexus," *Bi Xia Qu v. Holder*, 618 F.3d 602, 608 (6th Cir. 2010), the familial connection still must be a central reason for the persecution. Here, the BIA and IJ concluded that the petitioners "[were] not persecuted on the basis of *any* protected ground." *Marku*, 380 F.3d at 988 n.10.

(7th Cir. 2019) (noting that "the evidence here shows that the [Cartel de Jalisco Nueva Generación] was persecuting Gonzalez Ruano *for the stated purpose of destroying Catalina's family*" (emphasis added)).  And Limhi testified that his wife and children, who would clearly be members of the proposed particular social group, remain in Honduras and have not received threats from Los Tercerenos.  A.R. 183, 185, 200–04.  Petitioners fail to show that the familial connection was at least one central reason for persecuting them, as opposed to, for instance, the gang's actions being a result of its general, criminal goal of enacting revenge on one who reports gang activities to the police.  Put differently, harming Lidia's family was "a *means* to achieve some other goal, not an *end* in itself."  *Majano-De Hernandez v. Barr*, 777 F. App'x 810, 812 (6th Cir. 2019) (concluding that the gang was motivated by financial reasons); *see also Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037–38 (6th Cir. 2019) ("Cruz's evidence does not show that 18th Street's actions were motivated by a particular animus toward the Cruz-Guzman family itself, as opposed to an ordinary criminal desire for financial gain.").  Petitioners rely on only the existence of gang violence and the fact that their family was persecuted by Los Tercerenos, but this does not demonstrate that they were persecuted by Los Tercerenos on account of or because of their family membership.  For these reasons, we cannot conclude that the record compels a decision contrary to the one reached by the BIA.

## B.  Government is unwilling or unable to control non-governmental persecutors

To determine whether a government is unwilling or unable to control non-governmental persecutors, we "must examine 'the overall context of the applicant's situation[,]' and review 'all relevant evidence in the record[.]'"  *K.H.*, 920 F.3d at 475–76 (alterations in original) (citations omitted).  To do so, we consider "(1) the government's response to an asylum applicant's

persecution and (2) general evidence of country conditions." *Id.* at 476 (citing cases). Under the first inquiry, we evaluate the extent and success of police investigations into the alleged persecution, the extent of protection offered to the asylum seeker, and government concessions. *Id.* at 476–77. Under the second inquiry, we consider "(1) how certain crimes are prosecuted and punished, as well as (2) the efficacy of the government's efforts." *Id.* at 477–78 (citations omitted).

Petitioners bear the burden of showing that the BIA misapplied the law or failed to consider any evidence. *See Pilica*, 388 F.3d at 949–50 (citing cases). Though the IJ could not have applied *K.H.*'s framework because we decided *K.H.* after the IJ reached its holding in this case, there is no indication that the IJ did not consider evidence of country conditions. First, it noted the Department of State Human Rights Report for Honduras. A.R. 85. It also relied on *Khalili*, noting that a similar report was relevant evidence regarding the ability and willingness of a government to control non-governmental persecutors. A.R. 96, 100–01. The BIA expressly recognized *K.H.* and its directive to consider general evidence of country conditions when evaluating whether a government is unable or unwilling to protect asylum seekers. A.R. 4. Thus, petitioners have not demonstrated that the BIA or IJ failed to consider evidence of country conditions.

Furthermore, the evidence does not compel a conclusion contrary to the agency's determination that the Honduran government was willing and able to protect the petitioners. Local police were responsive to each of the petitioners' crises. When gang members demanded free meals, when Alex was murdered, and when Yony's brother was murdered, the police responded by investigating, offering protection, and/or working with Lidia to file charges. Though no arrests were made, nor charges brought, an investigation need not result in arrests or convictions to demonstrate that a government is willing or able to protect asylum seekers from the actions of non-

governmental actors. *See Borodachev v. Holder*, 441 F. App'x 354, 361 (6th Cir. 2011) (citing cases). But at least in this case, there is evidence that officials did investigate successfully and prosecute Los Tercerenos members for similar crimes, here, murder of another. Additionally, Lidia and Yony declined to follow up with police and to continue with efforts to press charges. Petitioners' reluctance to place themselves at further risk is understandable, but their decision to withdraw their participation makes it difficult to count the police's failure to arrest and prosecute the perpetrators of Alex's murder against the efficacy of the Honduran government's response.

Petitioners do not point to evidence of country conditions that convinces us that the agency's determinations are otherwise unsupported by substantial evidence. Petitioners point to evidence that shows violent, gang-related crime in Honduras is a significant problem and that police lack resources at times to respond effectively to such crime. Pet'r Br. at 17–18. But here, it does not appear that this was petitioners' personal experience with the police. The police responded, investigated, offered protection at least once, and were able to make arrests of Los Tercerenos members around the time that the gang murdered Alex. *See K.H.*, 920 F.3d at 478 (concluding that K.H.'s personal experience with the government's efforts to stop persecutors was not discounted by evidence of country conditions, nor was her personal experience dispositive). "While we may have reached a different result—and found that the government's response did not outweigh the record evidence demonstrating the struggles of the [Honduran] government to protect [the family]—that is not the standard." *Id.* Whether the record compels a reasonable adjudicator to reach a conclusion contrary to the agency's conclusion is a high standard, which the petitioners fail to clear here.

## IV. CONCLUSION

For these reasons, we hold that substantial evidence supports the BIA's and IJ's determinations that petitioners failed to demonstrate a nexus between their family group and persecution by Los Tercerenos members and failed to show that the Honduran government was unwilling or unable to protect the petitioners from their persecutors. Accordingly, we **DENY** the petition for review.