**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0832n.06

**Case No. 15-3081**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| | | **FILED** |
| | | Dec 28, 2015 |
| | | DEBORAH S. HUNT, Clerk |
| **JOSE ZALDANA MENIJAR,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | **ON PETITION FOR REVIEW** |
| v. | ) | **FROM THE UNITED STATES** |
| | ) | **BOARD OF IMMIGRATION** |
| **LORETTA E. LYNCH, Attorney General,** | ) | **APPEALS** |
| | ) | |
| Respondent. | ) | |
| | ) | **O P I N I O N** |

BEFORE: BATCHELDER, McKEAGUE, and STRANCH, Circuit Judges.

**McKEAGUE, Circuit Judge.** Jose Adolfo Zaldana Menijar petitions for review of an order of the Board of Immigration Appeals affirming the Immigration Judge's denial of his applications for withholding of removal and protection under the Convention Against Torture. Zaldana contends that the Board and Immigration Judge erred in finding that Zaldana: (1) failed to establish a "particular social group" within the meaning of the Immigration and Nationality Act; (2) failed to establish a nexus between his purported group and his fears of persecution; and (3) failed to establish that the Salvadoran government acquiesced or was willfully blind to the violent actions of Mara 18 gang members. For the reasons discussed below, we deny Zaldana's petition for review.

**I**

Petitioner Jose Adolfo Zaldana Menijar ("Zaldana") is a citizen of El Salvador.[1] A.R. 3. Zaldana testified that he entered the United States without legal authorization in either 2005 or 2006. A.R. 143. After his conviction for possession of cocaine, A.R. 219–20, DHS initiated removal proceedings and Zaldana was granted voluntary departure on June 11, 2009. A.R. 47. Zaldana did not depart voluntarily and was forcibly removed in September or October of 2009. A.R. 51. Zaldana illegally reentered the United States in March of 2010, was apprehended by DHS shortly thereafter, and then issued a notice of intent to reinstate his prior removal order. A.R. 48. On June 18, 2014, an asylum officer found Zaldana had a "reasonable fear" of persecution in El Salvador and referred him to the Immigration Judge for an individual merits hearing. A.R. 360–63. Before the Immigration Judge, Zaldana sought withholding of removal and protection under the Convention Against Torture ("CAT"). Zaldana claimed that if he were removed to El Salvador, he would be harmed on account of his membership in a particular social group, defined as "El Salvadoran male youth, who were forced to actively participate in violent gang activities for the majority of their youth and who refused to comply with demands to show their loyalty through increasing violence" or, alternatively, "active and long-term former gang members." A.R. 3.

*Testimony Evidence at Zaldana's Hearing.* Zaldana testified that he feared returning to El Salvador because the Mara 18 gang would kill him based upon his status as a former gang member who refused to participate in the gang's increasingly violent activities. A.R. 162. Zaldana explained his forced recruitment into the gang, beginning when he was seven years old and culminating at twelve with his "conversion" into a member after the gang beat him up,

---

[1] Petitioner's correct name, Jose Adolfo Zaldana *Menjivar*, was noted but never corrected in the agency proceedings.

threatened him, and told him that if he said anything, they would either kill him or a family member or "they would cut out his tongue." A.R. 51. Zaldana testified that he was a gang member for four or five years, during which time Zaldana was continually threatened and forced to do things "he did not like to do" including transporting drugs, extorting money, and being forced to watch the gang torture and murder his friend. A.R. 142, 144, 149. Zaldana claims he did not go to the police because he believed they could not protect him—instead, he decided to seek refuge by leaving El Salvador. A.R. 152.

After entering the United States for the first time in 2005 or 2006, Zaldana was forcibly removed to El Salvador in September or October of 2009. In November of that year, the gang re-integrated Zaldana, punishing his infidelity by giving him a "14"—where "14 members of the gang beat[] you for 14 minutes." A.R. 154. He testified that the gang spared his life only because he "was a kid and I didn't know what to do, but now I am a man." A.R. 154. After his re-integration, Zaldana claimed he was "again their toy . . . . Any minute that they wanted me to do something they [came] and pick[ed] me up." A.R. 156. Zaldana was again forced to steal, extort money, and transport drugs. A.R. 156. The gang then required Zaldana to prove his loyalty by physically assaulting his neighbor. A.R. 156. After Zaldana refused, the gang beat him again because "he was going bad," threatened his family, and extorted $3,000 from him. A.R. 158. Zaldana's brother-in-law went to the police as a result of this extortion. A.R. 159. The police apparently filed a report and said they would resolve the extortion issue, but Zaldana claims he "never saw results, the opposite" and received another gang beating a week or two later. A.R. 159. In March 2010, Zaldana again left El Salvador and entered the United States. A.R. 145–46.

Other witnesses testified before the Immigration Judge on Zaldana's behalf. Father Christopher Talbot, a Roman Catholic Priest who was familiar with Zaldana through his brother Luis, corroborated much of Zaldana's testimony regarding the brutality of gang violence in El Salvador. A.R. 107–26. Father Talbot stated that he believes all Salvadorans are at risk of gang violence, but noted that the likelihood of harm "depend[s] on the individual circumstance of each person." A.R. 122. Zaldana's nephew, Ulises Zaldivar, also testified on his behalf. A.R. 127–39. Zaldivar testified that in El Salvador he was perpetually afraid of the gangs and took steps to avoid being forcibly recruited, such as spending a significant amount of time at church and "mov[ing] from one family member to another family member so [the gangs] couldn't control [me]." A.R. 135. In addition to the oral testimony before the Immigration Judge, Zaldana presented significant documentary evidence including the 2012 U.S. Department of State Country Report on Human Rights Practices for El Salvador, A.R. 274–302 (to illustrate gang persecution of former members), and the U.S. Department of State 2013 Crime and Safety Report for El Salvador, A.R. 304–16 (as evidence of governmental acquiescence in the gangs' torture of Salvadoran citizens).

*The Immigration Judge's Decision.* On October 17, 2014, the Immigration Judge denied Zaldana's applications for withholding of removal and protection under the CAT, even though he found Zaldana and the other witnesses' testimony to be credible. A.R. 47–67. Regarding the application for withholding of removal, the Immigration Judge found insufficient evidence to establish that Zaldana's fears were on account of his membership in a particular social group. A.R. 62–63. Specifically, the Immigration Judge compared the facts of Zaldana's case to *Matter of W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014), a decision where the Board held that the former Mara 18 gang members in El Salvador who had renounced gang membership did not constitute a

particular social group because Salvadoran society did not view them as socially distinct. A.R. 62–64. The Immigration Judge thoroughly analyzed *W-G-R-* and, properly recognizing that it did not purport to establish a blanket rule regarding whether former gang membership could be socially distinct, looked to Zaldana's individual circumstances to determine that his social group also lacked the requisite social distinction. A.R. 64. The Immigration Judge also found that Zaldana's documentary evidence failed to show that Salvadoran society considered former gang members as a distinct social group. A.R. 63. Further, the Immigration Judge concluded that Zaldana was unable to establish a "nexus" between a protected ground under the Immigration and Nationality Act ("INA") and his fear of gang persecution on account of his status as a former long-term gang member. A.R. 63. Instead, the Immigration Judge found the gang members' desire to "enforce their warped code of conduct and to punish any perceived infidelity [to the gang]" as an equally plausible explanation for Zaldana's fear. A.R. 63. Finally, the Immigration Judge found Zaldana ineligible for withholding of removal under the CAT as the Salvadoran government's inability to control the gangs did not constitute governmental acquiescence in torture, especially as "the government of El Salvador is attempting to take steps and actions to deal with police corruption" and combat gang violence. A.R. 66.

*The Board's Decision.* Zaldana appealed to the Board of Immigration Appeals ("Board"), arguing that the Immigration Judge improperly relied on *Matter of W-G-R-*, which he asserted was distinguishable because his gang membership was longer and his participation in the gang more serious than that of the applicant in *W-G-R-*. A.R. 18–21. The Board affirmed the Immigration Judge, adopting much of the Immigration Judge's reasoning, but wrote separately to emphasize why the agency denied withholding of removal and protection under the CAT. A.R. 3–4. With respect to Zaldana's application for withholding of removal, the Board agreed with

the Immigration Judge that Zaldana's purported social group—"El Salvadoran male youth, who were forced to actively participate in violent gang activities for the majority of their youth and who refused to comply with demands to show their loyalty through increasing violence," or "active and long-term former gang members"—lacked the requisite social distinction within Salvadoran society. A.R. 3. The Board noted that, although Zaldana's evidence did "reflect that widespread gang violence is a serious problem in El Salvador," general conditions of crime and other societal afflictions do not afford protection under asylum and refugee laws. A.R. 3–4. The Board also affirmed the Immigration Judge's conclusion that Zaldana failed to establish a nexus between the harm he feared and his purported social group. A.R. 3.

The Board then affirmed the Immigration Judge's finding that Zaldana did not qualify for protection under the CAT. Acknowledging that Zaldana presented widespread evidence of corruption throughout the Salvadoran government, the Board concluded that the "evidence does not demonstrate a clear probability that, upon [Zaldana's] removal, a public official will acquiesce to any harm that [Zaldana] may experience at the hands of gang members." A.R. at 4. The Board then dismissed Zaldana's appeal and this petition for review followed.

## II

We have jurisdiction to review final orders of the Board. *See Umana-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013) (citing 8 U.S.C. § 1251(a)(1)). Where, as here, the Board "issued a separate opinion, rather than summarily affirming the IJ's decision, we review the [Board]'s decision as the final agency determination. To the extent the [Board] adopted the immigration judge's reasoning, however, [we] also review [ ] the immigration judge's decision." *Id.* (quoting *Hachem v. Holder*, 656 F.3d 430, 437 (6th Cir. 2011) (internal quotations omitted); *see also Yousif v. Lynch*, 796 F.3d 622, 628 (6th Cir. 2015). We review questions of law de

novo, but give "substantial deference . . . to the Board's interpretation of the INA and accompanying regulations." *Urbina-Mejia v. Holder*, 597 F.3d 360, 364 (6th Cir. 2010). The Board's interpretations of the INA are upheld "unless the interpretation is arbitrary, capricious, or manifestly contrary to the statute." *Umana-Ramos*, 724 F.3d at 670. Administrative findings of fact are reviewed for substantial evidence. *Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014). Under this deferential standard, Congress has specified that "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

## III

To qualify for withholding of removal, Zaldana must demonstrate a "clear probability" that, if removed to El Salvador, his "life or freedom would be threatened in that country because of [his] . . . membership in a particular social group[.]" 8 U.S.C. § 1231(b)(3)(A);[2] *Kouljinski v. Keisler*, 505 F.3d 534, 544 (6th Cir. 2007). The Board has defined the ambiguous term "particular social group" as having several requirements. First, putative members of a "particular social group" must share a "common, immutable characteristic." *Urbina-Mejia*, 597 F.3d at 365 (6th Cir. 2010) (citing *Castellano-Chacon v. I.N.S.*, 341 F.3d 533, 546 (6th Cir. 2003) (holding modified by *Almuhtaseb v. Gonzales*, 453 F.3d 743 (6th Cir. 2006)). Second, the group must satisfy a "particularity" requirement, meaning that the group can be described in terms sufficiently distinct such that the community would recognize it as a discrete class of persons. *Al-Ghorbani v. Holder*, 585 F.3d 980, 994 (6th Cir. 2009). Third, and the focus of this petition, the purported group must have "social visibility." *See Umana-Ramos*, 724 F.3d at 671.[3]

---

[2] 8 U.S.C. § 1231(b)(3)(A) also affords protection against persecution on the basis of race, religion, nationality, or political opinion.

[3] In *Umana-Ramos*, we affirmed our deference to the Board's definition of the term "particular social group" in 8 U.S.C. § 1231(b)(3)(A). 724 F.3d at 671–73. We specifically noted that the Board's definition of the statutory

The definition of "social visibility" has recently been clarified and this third requirement warrants additional explanation. After our decision in *Umana-Ramos* noted that "social visibility" required social salience, not "on sight" recognition by others in the community, 724 F.3d at 672, the Board published a precedential decision renaming "social visibility" as "social distinction" and clarifying that the visibility requirement was "never meant to be read literally" in the ocular sense. *See Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 240 (BIA 2014). Instead, the "social distinction" criterion requires social recognition—that is, members of the group "must be perceived as a group by society." *Id.* *See also Matter of W-G-R-*, 26 I. & N. Dec. 208, 216 (BIA 2014) ("To be socially distinct, a group need not be *seen* by society; it must instead be *perceived* as a group by society.") (emphasis added). As the definition of "social distinction" in *M-E-V-G-* is simply meant to clarify the Board's previous requirement of "social visibility" and is fully consistent with the Board's construction we accepted in *Umana-Ramos*, we use the term "social distinction"—instead of "social visibility"—in evaluating withholding of removal. *See generally Umana-Ramos*, F.3d at 671; *M-E-V-G-*, 26 I. & N. Dec. at 245 ("[W]e consider our interpretation of the phrase 'membership in a particular social group' to be consistent with our prior case law.").

## A

The Board's decision that Zaldana's proposed social group—"El Salvadoran male youth, who were forced to actively participate in violent gang activities for the majority of their youth and who refused to comply with demands to show their loyalty through increasing violence" or "active and long-term former gang members"—lacked social distinction is supported by

---

term is entitled to deference and "we defer to the reasonable boundaries that the Board creates with respect to the phrase." *Id.* at 671–72.

substantial evidence. A.R. 3.[4] First, as both the Board and IJ confirmed, the record contained no "documentary evidence to establish that Salvadoran society in general perceives, considers, or recognizes such persons to be a group." A.R. 3. Though the documentary evidence in the record does establish El Salvador as one of the most dangerous countries in the world, nothing in the record shows Salvadorans as viewing Zaldana's purported group as socially distinct within their society. A.R. 265–67.

Second, though not itself conclusive, the Board has already considered a group much like Zaldana's and found it to lack social distinction. *See Matter of W-G-R-*, 26 I. & N. Dec. at 209. In *W-G-R-*, the Board concluded that "former members of the Mara 18 gang in El Salvador who have renounced their gang membership" lacked social distinction because the documentary evidence, including the 2008 U.S. Department of State Country Report on Human Rights Practices for El Salvador (Zaldana used the 2012 version), did not demonstrate that the purported group was "perceived, considered, or recognized in Salvadoran society as a distinct group." *Id.* at 222. The Immigration Judge acknowledged that *W-G-R-* did not stand for the "blanket conclusion" that former gang membership could never form the basis for a distinct social group and, as required by *W-G-R-*, evaluated Zaldana's individual facts and circumstances. A.R. 64. However, even after earnestly considering Zaldana's arguments that *W-G-R-* was distinguishable, the Immigration Judge found that the evidence in this case, including the 2012 U.S. Department of State Country Report on Human Rights Practices for El Salvador, failed to

---

[4] The question of whether Zaldana's fear of persecution is "on account of" his membership in a particular social group is ultimately a question of fact. *See generally Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (noting whether member falls within a "particular social group . . . requires determining the facts and deciding whether the facts as found fall within [the] statutory term"); *Elias-Zacarias*, 502 U.S. 478, 483–84 (1992). *See also Khozhaynova v. Holder*, 641 F.3d 187, 196 (6th Cir. 2011); *Contreras-Torres v. Holder*, 542 F. App'x 456, 458 (6th Cir. 2013) (holding that substantial evidence supported agency's determination that applicant failed to establish fear of persecution was motivated by membership in a particular social group).

establish Zaldana's purported group as distinctly perceived by the Salvadoran society. A.R. 62–63. The Board agreed and we are not compelled to reach a contrary conclusion.

Zaldana's reliance on a 2013 U.S. Department of State Crime and Safety Report on El Salvador also fails to establish his purported group as socially distinct. Petitioner Br. at 7; A.R. 304. The report states that "the criminal threat in El Salvador is unpredictable, gang-centric, and characterized by violence directed against both *known associates* and targets of opportunity." A.R. 304 (emphasis added). To Zaldana, the reference to "known associates" establishes that former gang members like Zaldana are targeted by the gangs and must therefore be socially distinct. Even if we accept this reading and equate "known associates" with former long-term gang members, this evidence does not support the crucial requirement that *society*, not the gangs themselves, perceives former members as a socially distinct group. As the Board notes, while the "perception of the applicant's persecutors may be relevant because it can be indicative of whether society views the group as distinct . . . the persecutors' perception is not itself enough to make a group socially distinct." *Matter of W-G-R-*, 26 I. & N. Dec. at 218; *see also Castellano-Chacon v. I.N.S.,* 341 F.3d 533, 548 (6th Cir. 2003).

Like Zaldana's documentary evidence, his proffered testimony fails to undermine the agency's conclusion that "active and long-term former gang members" lacked the requisite social distinction within Salvadoran society. Father Talbot and Ulises Zaldivar presented compelling testimony of the risks posed by gang violence in El Salvador, but neither claimed that "El Salvadoran male youth who were forced to actively participate in violent gang activities for the majority of their youth and who refused to comply with demands to show their loyalty through increasing violence" were viewed as a distinct or separate group within Salvadoran society. In fact, when asked whether "the common people of El Salvador are safe from the

- 10 -

gangs," Father Talbot undermined Zaldana's group as socially distinct by testifying that gangs pose "a risk for everyone [but] to differing extents depending on the individual circumstances of each person." A.R. 122. Accordingly, the agency's determination that Zaldana's purported group is not socially distinct is supported by substantial evidence.

**B**

Substantial evidence further supports the agency's determination that Zaldana failed to establish a nexus between membership in his purported social group and his fear of persecution. Zaldana argues that, "because of his lengthy and active membership, the gang members are more likely to seek him out on account of his 'successful' prior membership—in order to compel him to return rather than punish him for leaving." Petitioner Br. at 9. But, as the Immigration Judge correctly noted, forced recruitment alone does not establish the nexus of persecution "on account of" a protected statutory ground. A.R. 64; *see I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 482 (1992) (holding that forced recruitment by guerillas seeking to "fill their ranks" does not constitute persecution "on account of" a statutorily protected ground). And Zaldana's argument does not compel us to conclude that his fear of gang violence is on account of his status as an "active and former long-term gang member." *Pascual v. Mukasey*, 514 F.3d 483, 486-87 (6th Cir. 2007) (explaining that the persecutor's motive is "critical" in determining whether an applicant receives statutory protection under the INA). Though Zaldana undoubtedly faced terrible mistreatment at the hands of Mara 18, including being forced to watch his friend's murder and being beaten at least twice by gang members, *see* A.R. 148–151, 155–56, such physical violence predominantly took place while he was still a gang member. Terrible as it may be, because the violence took place when Zaldana was not yet a "former long-term gang member," this mistreatment cannot have been "on account of" his purported group membership.

We accept, as did the Immigration Judge, that an equally plausible explanation for these violent actions was "not on account of [Zaldana] being a former gang member, but rather . . . the gang's desire or need to enforce [its] warped code of conduct and punish perceived infidelity." A.R. 63. Zaldana's fear of gang violence is certainly justified, but it lacks a nexus to his purported group membership. Father Talbot, Ulises Zaldivar, and Zaldana's family all expressed tremendous fear of the gangs, *see* A.R. 135–38, 237–45, though none have ever qualified as "former long-term gang members." Further, the record indicates that gangs indiscriminately target most if not all segments of society. A.R. 306 (gangs "target[] affluent areas for burglaries . . . [and are] quick to engage in violence if resisted"); *see Matter of M-E-V-G-*, 26 I. & N. Dec. at 250–51 (discussing the Mara 13 in El Salvador and noting that "[a]lthough certain segments of a population may be more susceptible to one type of criminal activity than another, the residents all generally suffer from the gang's criminal efforts to sustain its enterprise in the area"). Simply put, we agree with the Immigration Judge's conclusion, affirmed by the Board, that Zaldana presented insufficient evidence that a statutorily protected ground, instead of sheer criminal opportunism and depravity, would be the gang's motive in targeting him with violence. We sympathize with the plight of those in El Salvador facing pervasive extortion, forced recruitment, and violence at the hands of the gangs. *See* 2013 U.S. Department of State Crime and Safety Report on El Salvador, A.R. 304–05 (noting that seven murders and three carjackings occur daily in San Salvador). But widespread crime and violence does not itself constitute persecution on account of a protected ground. *Velasquez-Garcia v. Holder*, 336 F. App'x 517, 523 (6th Cir. 2009) (citing *Koliada v. INS*, 259 F.3d 482, 488 (6th Cir. 2001)); *see also Patel v. Gonzales*, 126 Fed. App'x. 283, 292 (6th Cir. 2005) ("[T]he record shows that Petitioner and his family have been the victim of several crimes, but such generalized lawlessness normally does not

constitute persecution."); *Konan v. Attorney Gen. of U.S.*, 432 F.3d 497, 506 (3d Cir. 2005). In conclusion, substantial evidence supports the agency's determination that former long-term gang members are not a socially distinct group in Salvadoran society, and that Zaldana failed to establish a sufficient nexus between this purported group and his fear of persecution. We deny his petition for review with regard to withholding of removal.

## IV

Under the CAT, the Attorney General may not remove an applicant who proves "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."[5] 8 C.F.R. § 1208.16(c)(2); *see also Ramaj v. Gonzales*, 466 F.3d 520, 532 (6th Cir. 2006). Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Haider v. Holder*, 595 F.3d 276, 289 (6th Cir. 2010) (quoting 8 C.F.R. § 1208.18(a)(1)) (internal quotation marks omitted). The CAT does not afford protection to torturous acts inflicted by wholly private actors. *Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001) (citing the *Regulations Concerning the Convention against Torture*, 64 Fed. Reg. 8478, 8482 (1999)).

The regulations implementing the CAT define the phrase "acquiescence of a public official" to require "that the public official, prior to the activity constituting torture, ha[s] [the] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7). We have further defined "acquiescence" to include willful blindness. *Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006).

---

[5] In reviewing the Board's decision to deny withholding of removal under the CAT, we reverse only where the decision is "manifestly contrary to law" and "not only supports a contrary conclusion, but indeed compels it." *Amir v. Gonzales*, 467 F.3d 921, 924 (6th Cir. 2006).

Zaldana fails to show a clear probability that he would be tortured with the Salvadoran government's acquiescence if removed to El Salvador. Neither Zaldana nor his witnesses ever testified that the gang violence he experienced and witnessed was through governmental acquiescence or willful blindness. Though Zaldana testified that he believed the police could not protect him from gang violence, A.R. 152, neither his, nor the other witnesses' testimony indicated that the police participated in, consented to, or willfully ignored the gang's brutality. The Board and the Immigration Judge were reasonable in their conclusion that, although El Salvador struggles with police corruption, "the government of El Salvador is attempting to take steps and actions to deal with police corruption" and these deliberate attempts to reduce corruption "undercut[] any argument that the government of El Salvador would acquiesce or consent in any torture[.]" A.R. 66. Further, the record includes at least some evidence that the Salvadoran government is accepting the United States' assistance in combating the country's gang enterprises. A.R. 306. That the Salvadoran government is unable to control the gangs does not constitute acquiescence. *See Ali v. Reno*, 237 F.3d at 597 (6th Cir. 2001); *Rreshpja v. Gonzales*, 420 F.3d 551, 557 (6th Cir. 2005) (considering the Albanian government's role in penalizing local police officers who are involved in human trafficking as cutting against petitioner's claims that the government acquiesces in forcing women into prostitution); *see also Garcia-Milian v. Holder*, 755 F.3d 1026, 1035 (9th Cir. 2013). Based on the evidence in the record, we are not compelled to reverse the Board's decision and so affirm its denial of Zaldana's request for protection under the CAT.

**V**

For the reasons above, we deny Zaldana's petition for review.