**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0432n.06

Case No. 19-3829

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| | | **FILED** |
| | | Jul 24, 2020 |
| ERASMO MATEO-VASQUEZ, et al., | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| Petitioners, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
| | ) | BOARD OF IMMIGRATION |
| WILLIAM P. BARR, Attorney General, | ) | APPEALS |
| | ) | |
| Respondent. | ) | |

BEFORE: GIBBONS, LARSEN, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. Erasmo Mateo-Vasquez, Maira Mateo-Vasquez, two minor children, and Honoria Vasquez-Perez (the Petitioners), all native citizens of Guatemala, challenge the Board of Immigration Appeals' (BIA) decision that they are not eligible for asylum, withholding of removal, or protection under the Convention Against Torture (CAT). They rest these claims on fears of gang violence if they return to Guatemala. But securing asylum under the Immigration and Nationality Act (INA) requires proof that the Petitioners face persecution stemming from membership in a protected social group. And the Petitioners present no evidence suggesting that their family status motivated the alleged persecution. We also find that the Petitioners have neither established that they will face torture upon returning to Guatemala nor shown that the Guatemalan government is unable or unwilling to protect them from future gang violence. So we DENY the petition for review.

I.

The Petitioners are a mother and her four children, all native Guatemalan citizens, who left their home country after an unnamed local gang tormented them. Erasmo Mateo-Vasquez first encountered the group in 2013 when he was eighteen years old. A handful of men belonging to an unspecified gang approached him with an offer to sell drugs for them and to participate in other organized criminal activities. Erasmo believed that the gang targeted him because he lacked financial resources. When Erasmo declined the offer, the men attacked him. Erasmo then told his parents, who filed a police report. Sometime later, gang members again approached Erasmo and when he fled, the men proclaimed that he was "not free." (AR 203.) These refusals led to escalating harassment and abuse. First, the gang beat Erasmo and broke his nose. Then they started orally threatening Erasmo at his home, yelling for him to come out. Following that, Erasmo began receiving threatening phone calls as part of the gang's recruitment efforts. In 2014, Erasmo fled Guatemala for the United States after enduring physical and emotional abuse from the gang. These events left Erasmo so distraught that he threatened to commit suicide if returned to Guatemala. He now believes that the gang would track down and kill him should he relocate to Guatemala.

Erasmo was not the only member of his family that the gang targeted. Maira Mateo-Vasquez, Erasmo's sister, caught the gang's attention in September 2013 when she followed Erasmo to a bar where she overheard gang members threatening him. Sensing Erasmo faced a dangerous situation, Maira tried to intervene. The gang at first attacked her, but then one member remarked that she could be valuable as a prostitute. After that, the gang members let the siblings leave the bar but warned against the family relocating to escape the gang's reach. In March 2014, Maira had another incident with the gang. After Erasmo went missing, Maira searched for him at the location where the 2013 confrontation occurred. Again, gang members approached Maira and

proclaimed that she could be a profitable prostitute for them. Despite verbal threats, the gang let Maira leave the bar unharmed. When she returned home, she discovered that her brother had come back after suffering another physical assault from the gang. On another occasion, a female gang member, Jesi Perez, attacked Maira. Jesi broke Maira's nose and arm because Maira rebuffed her recruitment efforts. Maira claims that she filed two police reports about Erasmo's interactions with the gang and that local officials failed to investigate the case. She testified that officers told her they could not act unless they had witnessed the criminal activity. Even so, Maira filed a police report about her incident with Jesi, which led to a court-ordered fine and protective order. Maira shared Erasmo's fear that the gang would kill her if she did not join its criminal activity. So she fled Guatemala to the United States in June 2014.

During these events, Honoria Vasquez-Perez, Erasmo and Maira's mother, also fell victim to the gang's harassment. Like Maira, she filed police reports about Erasmo's abuse from the gang and helped rescue Erasmo when he went missing. But the police did not investigate Honoria's reports because they lacked concrete proof. Then the harassment shifted to Honoria. Gang members would often call Honoria's home asking about Erasmo and Maira's whereabouts, threatening Honoria with vague consequences if she did not turn over her children. One time in 2013 or 2014, a gang member came to Honoria's home looking for Erasmo and Maira. In 2016, gang members surrounded the house and pelted it with stones. Still, Honoria did not relent to the gang's pressure. Instead, she too fled Guatemala for the United States in 2016 with her two minor children.

In sum, the Petitioners left Guatemala for the United States to avoid further conflict with the unnamed gang. Erasmo remained in custody for approximately a month after he entered the United States, and immigration officers interviewed him before stating he would be returned to

Guatemala. The Department of Homeland Security (DHS) issued Notices to Appear to the Petitioners, charging them as subject to removal for unlawfully entering and residing in the United States. The Petitioners responded by filing an application for asylum, a petition for withholding of removal, and a motion for relief under the CAT. After hearing testimony about the events described above, an Immigration Judge (IJ) ruled that the Petitioners offered inconsistent testimony and only found Honoria's testimony credible. Reasoning that the Petitioners could not show that the gang's hostility was motivated by the Petitioners' membership in a protected class, the IJ held that the Petitioners did not suffer from persecution. The IJ further concluded that the Petitioners' did not present evidence showing (1) that relocation in another part of Guatemala would fail to protect the Petitioners from the gang, or (2) that the Guatemalan government consented or acquiesced to the gang's behavior. So the IJ found against the Petitioners on all claims, and issued an "alternate finding that even if credible" the Petitioners did not show persecution motivated by their belonging in a protected social group. (AR 150, 157.) The Petitioners appealed this decision, but the BIA rejected the Petitioners' claims.

Agreeing with the IJ, the BIA assumed the Petitioners' credibility and ruled on alternate grounds. It concluded that the Petitioners neither showed that their membership in a protected class motivated the gang's hostility nor established that the Guatemalan government was unwilling or unable to control gang activity. So it found no error in the IJ's factfinding and denied the Petitioners' appeal. This petition for review followed the BIA's decision.

## II.

"Where, as here, the BIA reviews the IJ's decision and issues a separate opinion, rather than summarily affirming the IJ's decision, we review the BIA's decision as the final agency determination." *Gonzalez-De Leon v. Barr*, 932 F.3d 489, 492 (6th Cir. 2019) (quoting *Al-*

*Ghorbani v. Holder*, 585 F.3d 980, 991 (6th Cir. 2009)). "To the extent that the BIA has adopted the IJ's reasoning, however, we also review the IJ's decision." *Id.* This Circuit reviews questions of law de novo, but we give "substantial deference" to the BIA's interpretation of the INA and accompanying regulations. *Id.* That means "[t]he BIA's interpretation of the statute and regulations will be upheld unless the interpretation is arbitrary, capricious, or manifestly contrary to the statute." *Id.* (quoting *Khalil v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009)). "[T]o overturn [the BIA's] factual determination, 'we must find that the evidence not only *supports* [a contrary] conclusion, but *compels* it.'" *Sarr v. Gonzales*, 485 F.3d 354, 360 (6th Cir. 2007) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) (alterations in original)). This standard applies to asylum applications, withholding of removal petitions, and CAT relief. *See Harmon v. Holder*, 758 F.3d 728, 732–37 (6th Cir. 2014).

Alleged due process violations in removal proceedings receive de novo review. *Hassan v. Gonzales,* 403 F.3d 429, 435 (6th Cir. 2005). "Although IJs retain 'broad discretion in conducting [a removal] hearing,' the Fifth Amendment entitles immigrants facing deportation 'to a full and fair hearing.'" *Camara v. Holder*, 705 F.3d 219, 223 (6th Cir. 2013) (quoting *Lin v. Holder*, 565 F.3d 971, 979 (6th Cir. 2009) (alteration in original)).

III.

The Petitioners assert four claims: (1) that the BIA improperly denied their application for asylum; (2) that the BIA erred by finding them ineligible for withholding of removal; (3) that the BIA erred by denying relief under the CAT; and (4) that the proceedings below violated their due process rights.

"'To establish eligibility for asylum, an applicant must establish he is a "refugee" within the meaning of' the [INA]." *Bi Qing Zheng v. Lynch*, 819 F.3d 287, 294 (6th Cir. 2016) (quoting

*Lin*, 565 F.3d at 976). The INA defines a refugee as someone "who is unable or unwilling to return to . . . [his] country [of nationality] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). To secure withholding of removal, "applicant[s] must show 'a clear probability' that [they] would be subject to persecution if returned to the country in question." *Camara*, 705 F.3d at 225 (quoting *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006)).

Under the CAT, removal is improper when "it is more likely than not that [applicants] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). This Circuit understands torture under the CAT as: "'[A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted' to extract information, punish, intimidate, coerce, or otherwise discriminate, 'when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official . . . .'" *Haider v. Holder*, 595 F.3d 276, 289 (6th Cir. 2010) (quoting 8 C.F.R. § 1208.18(a)(1)). When determining the likelihood of future torture, we consider:

> (i) Evidence of past torture inflicted upon the applicant; (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and, (iv) Other relevant information regarding conditions in the country of removal.

8 C.F.R. § 208.16(c)(3).

Unlike the INA, "[t]he CAT does not afford protection to torturous acts inflicted by wholly private actors." *Zaldana Menijar v. Lynch*, 812 F.3d 491, 501 (6th Cir. 2015). Yet, acquiescence by a public official, such as "willful blindness," is enough to trigger CAT protection. *Id.* "Acquiescence of a public official requires that the public official, prior to the activity constituting

torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7).

Aliens may assert Fifth Amendment claims to challenge potential errors in removal proceedings. *Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005). This involves a two-step inquiry where we ask "first, whether there was a defect in the removal proceeding; and second, whether the alien was prejudiced because of it." *Id.* In short, "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).

A.

We begin with the Petitioners' asylum claim. They assert that they experienced persecution, and will likely experience future persectuion, because they belong to the Mateo-Vasquez nuclear family. Under the INA, "the applicant[s] must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant[s]." 8 U.S.C. § 1158(b)(1)(B)(i). So the Petitioners "must show that [their] membership in the [Mateo-Vasquez] family is 'one central reason' for the persecution." *Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037 (6th Cir. 2019). "This is a question of motive, not just simple causation." *Id.* Rephrased, the Petitioners must show a nexus between their family membership and the persecution inflicted by the unnamed Guatemalan gang. *See Al-Ghorbani*, 585 F.3d at 997. In short, "family membership 'cannot be merely incidental or tangential to the persecutor's motivation.'" *Quintero-Florentino v. Barr*, 788 F. App'x 348, 350 (6th Cir. 2019) (quoting *In re J-B-N- & S-M-*, 24 I. & N. Dec. 208, 213 (B.I.A. 2007)). "[I]ndiscriminate mistreatment" or "random crime" directed at a family does not amount to de

facto persecution under the INA. *Stserba v. Holder*, 646 F.3d 964, 972 (6th Cir. 2011) (quoting *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005)).

Under that standard, the Petitioners challenge the BIA's decision to uphold the IJ's determination that Guatemalan gang members did not target them because of their family status. Even accepting the Petitioners' testimony that gang members (1) assaulted, threatened, and intimidated members of the Mateo-Vasquez family and (2) are likely to repeat those attacks in the future, however, the Petitioners' testimony makes clear that the gang did not target them based on their family status.

We start with Erasmo. The alleged persecution began when gang members approached Erasmo for recruitment purposes and repeatedly attacked him when he refused to assist with their criminal enterprises. Erasmo opined that the gang targeted him because he was "somebody with low income" and for "not being presented as well as [his] other friends." (AR 245.) That suggests Erasmo's family ties did not motivate the gang's recruitment efforts. And his sister, Maira, also testified that the gang recruited her brother to help with its nefarious activities and that it targeted him because he was "really lacking resources." (AR 267.) For over a year, the gang would seek to kidnap Erasmo while physically abusing him. But no evidence suggests that the gang did so because of his family ties.

Next, Maira claims that the gang targeted her based on her relationship to her brother. But she testified that she drew the gang's attention during an incident where she tried to disrupt its effort to recruit her brother. Although the gang at first reacted to Maira with hostility, one member stifled the conflict by claiming that Maira would be a "great whore." (AR 269.) On another occasion, the gang recruited her as a prostitute because it believed she could "make a lot of money" for them. (AR 271.) After these incidents, Maira came to the United States. So nothing in Maira's

testimony reflects that her family status motivated the gang's mistreatment of her. Instead, it appears the gang simply wanted to use Maira to further its criminal activity.

Finally, Honoria, the mother of Maira and Erasmo, testified that the gang harassed her family. In doing so, Honoria confirmed her children's testimony that the gang intimidated and physically assaulted her family members. But she also speculated that the gang's motivation was likely to recruit her son "to be among [its] workers." (AR 307.) During 2014, Honoria received four phone calls from gang members who wanted to speak to her children, many of which involved vague threats about Honoria having "to pay the consequences" if she failed to turn her children over to the gang. (AR 316.) Again, these misdeeds seem to have more to do with gang recruitment than persecuting the Mateo-Vasquez family.

The Petitioners contend that this unfortunate series of events arose from their membership in the same nuclear family. Making that claim, they assert "[t]here is no evidence in the record that the gang would have been terrorizing [the Petitioners] . . . if [Erasmo] had not refused to comply with their demands." (Pet'rs' Br. at 60.) But that argument misunderstands what it means for persecution to have a nexus with a protected group. The Petitioners' testimony reveals that the gang recruited Erasmo because he was vulnerable and he could help the gang execute its misdeeds. And it seems that the gang took interest in Maira as a potentially lucrative prostitute. Similarly, the gang threatened Honoria because recruiting her children would benefit its endeavors. So there's little evidence that the Petitioners' family relationship was a central or driving motivator for the gang's heinous acts. As a result, the alleged persecution lacks a nexus with the Petitioners' purported social group; the gang simply exercised force and threats because those methods furthered its criminal activity. It follows that the family relationship between the Petitioners was at most tangential to the gang's interest in carrying out its narcotics and prostitution schemes.

Although we sympathize with the physical and mental injuries suffered by the Mateo-Vasquez family, the record suggests that the gang used force and threats against the Petitioners to perpetrate criminal activity. Being targeted by criminals for the usual reasons, and not based on membership in a protected group, cannot support an application for asylum. *Stserba*, 646 F.3d at 972.

In sum, a tangential correlation between violence and a protected social group does not satisfy the INA's requirement that membership in the protected group be a central reason for the persecution. *Quintero-Florentino*, 788 F. App'x at 350. So we agree with the BIA's denial of the Petitioner's asylum application.[1]

B.

Independent of the INA, the Petitioners seek relief under the CAT based on fear of future gang violence. To obtain relief, they must show a likelihood of experiencing torture should they return to Guatemala and that the Guatemalan government would acquiesce to that torture. 8 C.F.R. § 1208.18(a). Here, the Petitioners fear harm at the hands of private, not public, actors. Although the record contains testimony from the Petitioners that the Guatemalan police failed to protect them or prosecute gang members, "the police's failure or inability to protect citizens, alone, does not show acquiescence." *Bravo-Domingo v. Barr*, 806 F. App'x 443, 449 (6th Cir. 2020) (citing *Torres v. Sessions*, 728 F. App'x 584, 589 (6th Cir. 2018)). And general evidence suggesing (1) the Guatamelan's government general inability to prevent crime and (2) that gangs abuse citizens with "impunity" in Guatemala is not enough to warrant relief under the CAT. *See id.*

---

[1] Although the Petitioners seek review of the BIA's denial of withholding of removal, they analyze their asylum and withholding of removal claims under the same rubric. They make no independent arguments about their withholding of removal claims and, for that matter, barely mention them at all. To the extent that the Petitioners preserved their withholding claims for appeal, they specifically linked them to their asylum claims, which fail.

Here, the Petitioners rely on evidence that gangs commit hundreds of murders, along with other violent acts, without recourse in Guatemala each year. But that does not show that a specific gang will likely torture the Petitioners if removed or that Guatemalan police will turn a blind eye to that torture. What's more, the record does not reflect that the gang remains interested in recruiting or harming anyone in the Mateo-Vasequz family. We also lack much information about the gang, including its name, size, and geographic reach. That means the Petitioners cannot show that relocating within Guatemala to avoid the gang would be impracticable. After reviewing the record, we find that the Petitioners present insufficient evidence supporting a risk of future torture, accompanied by the Guatamelan government's acquiesence, to meet the standard for CAT claims.

## C.

Finally, the Petitioners argue that the BIA and IJ violated their Fifth Amendment due process rights during the proceedings below. That is because the BIA and IJ allegedly committed several procedural errors when making credibility determinations, such as failing to consider all relevant factors, ignoring the totality of the circumstances, and disregarding Erasmo's PTSD. But the BIA ruled against the Petitioners "even assuming that they all testified credibly[.]" (AR 4.)

Because the BIA ruled assuming favorable credibility findings for the Petitioners, no prejudice arose from any credibility errors made by the IJ or the BIA. *See Al-Ghorbani*, 585 F.3d at 980 (finding that alleged constitutional violations did not prejudice the petitioners because the outcome would have been the same regardless of the error). So despite the IJ only finding Honoria Vasquez-Perez credible, and not her children, that credibility finding did not affect the BIA's decision. Thus, the Petitioners' due process claim fails.

## IV.

For these reasons, we DENY the petition.