NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0018n.06

Case No. 23-3426

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Jan 16, 2024

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| HEIDY CAROLINA GOMEZ ANDRET and CIRILO GOMEZ ANDRET, | ) ) ) | |
| Petitioners, | ) ) | ON PETITION FOR REVIEW FROM THE UNITED STATES |
| v. | ) ) | BOARD OF IMMIGRATION APPEALS |
| MERRICK B. GARLAND, Attorney General, | ) ) | |
| Respondent. | ) ) ) | **O P I N I O N** |

Before: McKEAGUE, LARSEN, and MURPHY, Circuit Judges.

**McKEAGUE, Circuit Judge.** Teenaged siblings Heidy and Cirilo Gomez Andret fled their home country of Guatemala under remarkably difficult circumstances. Fearing their violent neighbor and sexually abusive uncle, Heidy and Cirilo requested asylum in the United States. They also sought withholding of removal and protection under the U.N. Convention Against Torture. But our immigration courts denied such relief because, among other things, Heidy and Cirilo couldn't show that the Guatemalan government was unable or unwilling to protect them. Nor could they show a likelihood of torture with the government's acquiescence. Because substantial evidence supports that decision, we must **DENY** the siblings' petition for review.

### I.

Heidy Carolina Gomez Andret and Cirilo Gomez Andret are siblings from Guatemala. In 2016, when Heidy was 15 and Cirilo was 13, they applied for admission at a U.S. port of entry.

Immigration authorities released Heidy and Cirilo into the custody of their mother in Nashville and, a few months later, commenced removal proceedings against them. Both siblings conceded removability.

Heidy and Cirilo applied for asylum, withholding of removal, and relief under the U.N. Convention Against Torture. They both feared harm if forced to return to Guatemala. Heidy and Cirilo attached a variety of supporting documents to their applications, including a scholar's expert report and several articles on Guatemala's current conditions.

The siblings appeared before an immigration judge in July 2019 for a consolidated hearing. Heidy and Cirilo (then aged 18 and 16, respectively) testified in support of their immigration applications. Their testimony told the following story:

Heidy and Cirilo lived in a small Guatemalan town with their grandparents. Their grandfather is a village elder and landowner. Heidy and Cirilo, like their grandfather, are indigenous. They speak both Spanish and their community's native Achi language. In Guatemala, indigenous people are perceived as less worthy than non-indigenous Spanish speakers. And land ownership is particularly important to indigenous families; landowners are treated better and are deemed more powerful than those who don't own land.

The siblings' grandfather has long been embroiled in a bitter land dispute with a neighbor. That neighbor, Elena Ruiz, accused the grandfather of stealing some of her land. Partly indigenous herself, Elena Ruiz is a prominent village elder with more power than the siblings' family. She sued the grandfather in a local court, but the court ruled against her. Furious, Elena Ruiz put up obstructive fencing and cut off water to the grandfather's house. However, the grandfather successfully obtained a court order freeing access to his house. The two elders battled in court several times over the course of the dispute, and the court consistently ruled in the grandfather's favor. Finally, the court ordered the grandfather to buy the portion of Elena Ruiz's land that was

closest to his. This further enraged Elena Ruiz. The land dispute between elders divided the town; some supported the grandfather, but most supported Elena Ruiz.

Elena Ruiz sometimes resorted to violence, occasionally directed toward Heidy and Cirilo. She would insult and threaten the siblings. She threw rocks and sticks at them and chased them with her machete. One morning, Heidy and Cirilo heard gunshots near their house—although they never saw the gunmen, they believe that Elena Ruiz's workers were responsible. On a different occasion, their grandfather came home with a dislocated arm and told the siblings that one of Elena Ruiz's workers had beaten him. Heidy and Cirilo also believe that Elena Ruiz claimed responsibility for poisoning and killing one of their cousins. Both siblings fear that she will kill them if they return to Guatemala.

Heidy and Cirilo testified that their family unsuccessfully sought assistance from the authorities to curb Elena Ruiz's violent behavior. According to Cirilo, his grandparents requested help from the judiciary to no avail. And both siblings said that their family had reported the shooting and poisoning incidents to law enforcement. However, nothing came of the reports and the police never arrested anyone. Cirilo believes that the police were indifferent because his family is indigenous. Heidy thinks that the police held off because Elena Ruiz bribed them. And both attested that Elena Ruiz could kill with impunity because of her influence over the police in their town. The siblings never personally sought a restraining order in court or visited the police station. Such a step would have been futile, Cirilo explained, because there was little chance of the police believing them.

The siblings also testified about their uncle, Santiago Ruiz. When Heidy was ten years old, Santiago Ruiz sexually assaulted her. He then threatened to hurt her again if she told anyone. Heidy felt too scared to tell anyone at the time, and she never reported the assault to the authorities. Later, after entering the United States, Heidy confided in her mother. She also told Cirilo. The siblings' mother telephoned Santiago Ruiz to confront him, and the uncle threatened to kill both children if

they ever returned to Guatemala. Cirilo believes Santiago Ruiz will carry out that threat because his uncle always carries a weapon and is mentally unwell. Heidy also fears that Santiago Ruiz will kill her. She doesn't think that the Guatemalan authorities will protect her because, she explained, women in Guatemala—particularly sexual-assault survivors—are perceived as worthless.

Before the hearing ended, the immigration judge asked Heidy and Cirilo about the lack of corroborating evidence in the record. The judge noted that the siblings hadn't provided letters from their grandparents or others in their town. Nor had they provided any copies of police reports or court filings documenting their family's dispute with Elena Ruiz. In response, the siblings said that they had obtained a letter from their grandfather but did not submit it in time. And Cirilo explained that he and his sister never thought to ask their grandparents for other corroborative documents.

The immigration judge denied relief in a detailed written opinion. She found Heidy and Cirilo credible but decided that their testimony required corroboration. After all, the testimony was "somewhat generalized" about Elena Ruiz's threatening and violent conduct. Admin. R. 86. And many of the siblings' suppositions "were not supported by any detail," including their belief that Elena Ruiz routinely bribed the police and could murder people without repercussion. *Id.* The record lacked important details: information about how local police operated, evidence pertaining to the poisoned cousin, and specifics regarding the grandfather's land dispute. The judge was not satisfied by Heidy and Cirilo's limited explanation for the absent corroborating evidence.

Turning to the elements of the siblings' claims, the immigration judge reasoned that Heidy and Cirilo fell short for several independent reasons. Their asylum and withholding of removal claims failed because the siblings hadn't sufficiently shown that the Guatemalan government was unwilling or unable to control Elena Ruiz and Santiago Ruiz. Nor could Heidy and Cirilo demonstrate, among other things, that they faced persecution on account of a statutorily protected ground. And the siblings' Convention Against Torture claim similarly failed because they couldn't prove a likelihood of torture with the government's acquiescence.

The Board of Immigration Appeals summarily affirmed the immigration judge's order without issuing a written opinion. For purposes of our review, the immigration judge's order is therefore the final agency decision. *See Denko v. I.N.S.*, 351 F.3d 717, 730 (6th Cir. 2003). Heidy and Cirilo now petition us for review.

## II.

We review the immigration judge's legal conclusions de novo and her factual findings for substantial evidence. *Zometa-Orellana v. Garland*, 19 F.4th 970, 976 (6th Cir. 2021). The substantial-evidence standard is highly deferential—we cannot disturb a factual finding unless the evidence compels a contrary conclusion. *Dieng v. Holder*, 698 F.3d 866, 871 (6th Cir. 2012). In other words, the immigration judge's factual findings bind us whenever any reasonable adjudicator could make the same findings. *See id.* at 871–72.

Applicants seeking relief from removal bear the burden of proving their eligibility. 8 U.S.C. § 1229a(c)(4)(A). Sometimes, their credible testimony alone can suffice. However, immigration judges may require corroborating evidence if otherwise credible testimony is insufficiently persuasive or does not refer to "specific facts sufficient to demonstrate" that the burden of proof has been satisfied. *Id.* § 1229a(c)(4)(B); *see id.* § 1158(b)(1)(B). When an immigration judge reasonably deems corroborating evidence necessary, the applicant must provide corroborative evidence or offer a compelling explanation for why such evidence is not reasonably available. *Lin v. Holder*, 565 F.3d 971, 976–77 (6th Cir. 2009). We review the immigration judge's determination about the availability of corroborative evidence under the deferential substantial-evidence standard. *Guzman-Vazquez v. Barr*, 959 F.3d 253, 264 (6th Cir. 2020); *see* 8 U.S.C. § 1252(b)(4).

## III.

Heidy and Cirilo seek three different forms of relief from removal. First and foremost, they argue that they qualify for asylum. Second, they seek withholding of removal. Finally, they request relief under the U.N. Convention Against Torture.

**A. Asylum**

We begin with the siblings' asylum claim. The attorney general wields the discretionary power to grant asylum to those who qualify as "refugees." *Mbonga v. Garland*, 18 F.4th 889, 892 (6th Cir. 2021). And Congress has defined "refugee" to mean those who are unable or unwilling to return to their home country because of past persecution or a "well-founded fear" of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Asylum applicants bear the burden of proving that they qualify as refugees. *Juan Antonio v. Barr*, 959 F.3d 778, 789 (6th Cir. 2020).

Persecution incorporates a state-action element—alleged harm cannot qualify unless "inflicted by the government or by private parties that the government is 'unable or unwilling to control.'" *Ortiz v. Garland*, 6 F.4th 685, 688 (6th Cir. 2021) (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 222 (B.I.A. 1985)). If alleged persecutors are private actors, the asylum applicant must prove that he or she "cannot reasonably expect the assistance of the government" in controlling the harmful conduct. *Juan Antonio*, 959 F.3d at 793 (citation omitted). Adjudicators must consider the record as a whole when conducting this state-action inquiry. Relevant information includes both (1) the government's specific response to the applicant's alleged persecution and (2) general evidence of country conditions. *K.H. v. Barr*, 920 F.3d 470, 476 (6th Cir. 2019); *see Ortiz*, 6 F.4th at 689.

Here, the immigration judge determined, among other things, that Heidy and Cirilo failed to prove the state-action component of persecution. It is undisputed that both Elena Ruiz and Santiago Ruiz are private actors. And, the judge concluded, the siblings couldn't show that the Guatemalan government was unwilling or unable to control those actors. We review that conclusion for substantial evidence. *See Ortiz*, 6 F.4th at 688–89. Applying that standard, we must deny relief.[1]

---

[1] Because this conclusion forecloses the siblings' asylum and withholding of removal claims, we need not address the immigration judge's alternative grounds for denying relief.

### 1. Violent Neighbor

Start with Elena Ruiz, the siblings' violent neighbor. Substantial evidence supports the immigration judge's conclusion that Heidy and Cirilo failed to show the Guatemalan government's unwillingness or inability to control her. According to their testimony, neither Heidy nor Cirilo personally reported Elena Ruiz's violent behavior to the police or judiciary. True, both siblings testified that their family members unsuccessfully requested help from the government. But, critically, Heidy and Cirilo failed to provide corroborative evidence for those assertions. That failure effectively dooms their claims.

Requiring such corroborative evidence was reasonable in this case. After all, the immigration judge found the siblings' testimony "somewhat generalized" about Elena Ruiz's violence. Admin. R. 86. Some of their beliefs—such as their assertions regarding Elena Ruiz's influence over the police—were "not supported by any detail." *Id.*; *see* 8 U.S.C. § 1158(b)(1)(B). And Heidy and Cirilo were children at the time of the incidents; several years had since elapsed. *See Guzman-Vazquez*, 959 F.3d at 258, 264–65 (deeming it appropriate to require evidence corroborating applicant's testimony about events that occurred several years ago when he was a teenager). All things considered, the judge did not overstep by expecting a letter from the siblings' grandparents or other adults in their community. It was similarly reasonable to expect copies of court documents or police reports to help clarify what the family had reported and why the authorities didn't act.

The siblings failed to adequately justify the corroborative evidence's absence. When pressed by the judge, they explained that they had obtained a letter from their grandfather but did not timely provide it to the court. The only other explanation given—beyond running out of time—was that the siblings never thought to ask their grandparents for copies of police reports, court filings, or other documents. Notably, the siblings were represented by an immigration lawyer and had years to obtain corroborating evidence. And they never claimed that corroborating documents

were unavailable.[2] The judge deemed their explanation insufficient, and substantial evidence supports that judgment. Immigration judges routinely expect applicants to obtain helpful corroborative documents from their home country. *E.g.*, *Lin*, 565 F.3d at 977.

Even setting aside that particular corroboration problem, other evidence justifies the immigration judge's conclusion that there was no state action. Assume for a moment that the siblings' family indeed reported their neighbor's conduct to the authorities. It does not necessarily follow that law enforcement's failure to formally investigate or arrest Elena Ruiz constitutes an unwillingness or inability to control her. *See, e.g.*, *Skirko v. Gonzales*, 153 F. App'x 958, 961 (6th Cir. 2005) (failure to investigate); *Borodachev v. Holder*, 441 F. App'x 354, 361 (6th Cir. 2011) (failure to apprehend). As the judge pointed out, the record leaves open the possibility that Guatemalan authorities did nothing "because there was insufficient information to provide for an investigation, arrest, or prosecution." Admin. R. 88. After all, the siblings couldn't provide much detail about some of Elena Ruiz's alleged violent behavior—most notably, the purported poisoning of their cousin. And the siblings never substantiated their assumption that anti-indigenous bias or Elena Ruiz's corrupt influence caused the authorities' inaction.

Moreover, substantial evidence suggests that the Guatemalan judicial system worked. The siblings' grandfather consistently used the court system to protect his legal interests against his neighbor. For example, the judiciary stepped in to help when Elena Ruiz attempted to unlawfully block access to the grandfather's house. That responsiveness is difficult to square with the siblings' contention that Elena Ruiz wielded enough power over local authorities to prevent government intervention.

---

[2] On appeal, the siblings argue that they were both minors when they fled Guatemala, "which would have hampered any efforts to attempt to obtain documentation from the authorities." Pet'rs' Br. 19–20. They similarly point to reports in the record describing corruption and other problems with the Guatemalan authorities. But Heidy and Cirilo failed to make those arguments in their hearing before the immigration judge. Even assuming that we can now entertain them, their arguments do not address why the siblings couldn't obtain documents or letters from their grandparents.

Heidy and Cirilo disagree. They direct us to reports and articles in the record describing current conditions in Guatemala. That evidence, they suggest, shows the Guatemalan government's inability or unwillingness to curb violence related to land disputes—particularly disputes involving indigenous communities. But as the immigration judge noted, most of the reports' information is not particularly relevant to the facts in this case. The reports provide an overview of Guatemala's historic mistreatment of indigenous people. They also detail land conflicts between indigenous communities and the government, especially with regard to infrastructure projects and mining licenses. We agree with the immigration judge that such information is largely inapposite to private land disputes between neighbors.

To be fair, the reports do provide some helpful background information. They briefly touch on private land disputes, noting that Guatemala has a lot of them and that such disputes frequently involve indigenous communities. They also explain that Guatemalan courts are often too inaccessible or inefficient to adequately resolve such disputes. More generally, the reports describe corruption within the Guatemalan government and high levels of violent crime.

Though relevant, that information does not change our conclusion. The immigration judge acknowledged the mistreatment of indigenous communities, government corruption, and limited resources available to tackle violent crime. But she also pointed out evidence from the reports showing Guatemala's "substantial efforts" to improve access to justice for indigenous communities. Admin. R. 88–89. A holistic review of the record—including the grandfather's success in accessing local courts—thus does not compel a conclusion that the government was unable or unwilling to control Elena Ruiz.

### 2. Abusive Uncle

Turning to the siblings' abusive uncle, we reach the same conclusion. Substantial evidence supports the immigration judge's finding that the siblings failed to show state action. As a threshold matter, the Guatemalan government never had an opportunity to respond to Santiago

Ruiz's sexual assault or threats because nobody reported the misconduct to law enforcement. We've previously held that an applicant's failure to report private abusers to the authorities is an important—albeit non-dispositive—factor against finding persecution. *See Ortiz*, 6 F.4th at 689–90; *see also José-Tomás v. Barr*, 822 F. App'x 354, 358 (6th Cir. 2020) (noting applicant's failure to report sexual assault to Guatemalan authorities).

Of course, we cannot ignore the country conditions that may have colored Heidy's decision not to report Santiago Ruiz. *See K.H.*, 920 F.3d at 477–78. Heidy testified about Guatemala's stigma against sexual-assault survivors and her belief that authorities do not punish male abusers. To an extent, reports and articles in the record back her up. They explain that violence against women—especially indigenous women—remains a serious problem in Guatemala, and impunity for perpetrators is quite high. The siblings' scholarly expert report similarly underscores Guatemala's pervasive culture of "machismo," which protects abusive men like Santiago Ruiz.

But, taken as a whole, the record does not compel a finding that the siblings couldn't expect help from the Guatemalan government. In reaching her decision, the immigration judge emphasized the significant steps that Guatemala has implemented to curb gender-based violence and punish offenders. For example, the government has established special prosecutors, heightened criminal penalties, and specialized courts to combat crimes against women. Courts are empowered to issue restraining orders against alleged abusers. The government also provides shelters and free legal and medical services to aid survivors of gender-based violence. Some programs are targeted specifically at helping indigenous women. And Guatemalan authorities have taken similar steps aimed at stopping sexual abuse against minors. The immigration judge further noted that, because Heidy and Cirilo both speak fluent Spanish, they wouldn't face the language barrier preventing many indigenous people from meaningfully accessing justice. Given these considerations, the judge reasonably concluded that the siblings fell short of showing persecution.

Resisting that conclusion, Heidy and Cirilo turn to our decision in *Juan Antonio v. Barr*, 959 F.3d 778 (6th Cir. 2020). But *Juan Antonio* is distinguishable. There, we concluded that the record compelled a finding that the petitioner couldn't reasonably expect the Guatemalan government's assistance in controlling her abusive husband. 959 F.3d at 794. For years, the abuser in *Juan Antonio* beat, raped, and threatened the petitioner. *Id.* at 785–86. And his abuse continued even after the petitioner repeatedly sought help from the authorities; the judiciary's attempts to restrain the abuser proved ineffective. *Id.* at 794–95. This case, however, presents a different situation. Importantly, the Guatemalan government was never notified of Santiago Ruiz's abuse. *See Ortiz*, 6 F.4th at 689–90; *José-Tomás*, 822 F. App'x at 358. Relatedly, no evidence suggests that his abusive conduct continued despite the government's best efforts to stop it. Given the holistic and fact-specific nature of this inquiry—and our deferential standard of review—it makes sense that the two cases would reach different outcomes.

## B. Withholding of Removal

The siblings' claims for withholding of removal fail for the same reason as their asylum claims. Under the Immigration and Nationality Act, the attorney general cannot remove a person to a country if he decides that the person's "life or freedom would be threatened in that country" on account of a protected ground. 8 U.S.C. § 1231(b)(3). An applicant is thus entitled to withholding of removal if he or she "can establish a clear probability of future persecution." *Sebastian-Sebastian v. Garland*, 87 F.4th 838, 851 (6th Cir. 2023) (citation omitted). Withholding claims require consideration of the same factors as asylum claims—but impose a higher standard of proof on the showing of persecution. *Yousif v. Lynch*, 796 F.3d 622, 629 (6th Cir. 2015). As a result, applicants necessarily fall short on their withholding claims when they cannot show a well-founded fear of persecution under the more forgiving asylum standard. *See Dieng*, 698 F.3d at 874.

As described above, substantial evidence supports the immigration judge's decision that Heidy and Cirilo cannot show that the Guatemalan government is unable or unwilling to protect

them from Elena Ruiz and Santiago Ruiz. The siblings failed to establish "persecution," thereby foreclosing their claims for withholding of removal.

### C. Convention Against Torture

Finally, the siblings seek withholding of removal under the U.N. Convention Against Torture. To qualify for relief under the Convention, an applicant must prove "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Like persecution, "torture" requires state action. Federal regulations define it as the intentional infliction of pain or suffering on a person "by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity." *Id.* § 208.18(a)(1). In turn, "acquiescence" requires that "the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* § 208.18(a)(7). To prevail, applicants must show that government officials had "actual knowledge" of—or "willful blindness" toward—the torturous acts. *Id.*; *see Zaldana Menijar v. Lynch*, 812 F.3d 491, 501 (6th Cir. 2015).

Substantial evidence supports the immigration judge's decision that Heidy and Cirilo failed to show that the Guatemalan government "would turn a blind eye in acquiescence to any torture." Admin. R. 91. Regarding Elena Ruiz's violence, the siblings failed to provide the required corroborating evidence to demonstrate that public officials were notified of her conduct and failed to intervene. And the record hardly compels a finding that the Guatemalan government deliberately avoided learning about her violence. In fact, the record suggests that the Guatemalan judiciary was relatively responsive whenever the siblings' grandfather complained about his neighbor. Turning to the abusive uncle, nothing in the record suggests that the Guatemalan authorities had actual knowledge of Santiago Ruiz's sexual assault or threats. That Guatemala still struggles to control gender-based violence does not constitute acquiescence in it—especially given the active steps the government has taken toward combatting such harm. *Cf. Rreshpja v. Gonzales*, 420 F.3d 551, 557

(6th Cir. 2005) (human trafficking); *Zaldana Menijar*, 812 F.3d at 502 (gang violence). Reasonable adjudicators could therefore deny the siblings relief under the Convention.

## IV.

Substantial evidence supports the immigration judge's decision to reject Heidy and Cirilo's claims for relief. We therefore **DENY** their petition for review.